## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

NATALIE BRADLEY and REBECCA
ALVAREZ,

        Plaintiffs,

vs.                                          Civ. No.  24-cv-00497

NEW MEXICO HIGHLANDS UNIVERSITY,
BOARD OF REGENTS OF NEW MEXICO
HIGHLANDS UNIVERSITY (A/K/A THE
BOARD OF REGENTS OF NEW MEXICO
NORMAL UNIVERSITY), AND GLORIA
GADSDEN.

        Defendants.

### COMPLAINT FOR VIOLATIONS OF THE FAMILY MEDICAL LEAVE ACT, AMERICANS WITH DISABILITIES ACT, NEW MEXICO HUMAN RIGHTS ACT, AND WHISTLEBLOWER PROTECTION ACT

Plaintiffs Natalie Bradley ("Ms. Bradley") and Rebecca Alvarez ("Dr. Alvarez"), by and through their counsel, Trent A. Howell, bring this Complaint against New Mexico Highlands University ("NMHU") and Gloria Gadsden ("Dr. Gadsden").

### SUMMARY OF CLAIMS AND KEY FACTS

1.      This action is brought within the Court's federal question jurisdiction under 28 U.S.C. § 1331 and ancillary supplemental jurisdiction under 28 U.S.C. § 1367 for redress of Defendants' violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*., as amended by the ADA Amendments Act of 2008, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. ("Sec. 504"), New Mexico Human Rights Act, NMSA § 28-1-1, *et. seq*. ("HRA"), and New Mexico Whistleblower Protection Act, NMSA § 10-16C-4 NMSA 1978, *et seq*. ("WPA"), by terminating Ms. Bradley's employment effective January 27, 2023, and by

harassing Dr. Alvarez and other staff and students in a continuing action from October 2022 to the present date, through and in culmination of an escalating pattern of serious-medical-condition and disability discrimination and retaliation, as follows.

      2.   Venue is appropriate because the actions complained of are conduct and employment practices of Defendants, who operate and employed Plaintiffs within the District of New Mexico, subject to the employment laws of the State of New Mexico.  28 U.S.C. § 1391. And such actions subject Defendants to the personal jurisdiction of the District of New Mexico as to this civil action.  *Id*.

      3.     The above facts make this action timely, confer jurisdiction over the parties and subject matter hereto in the District of New Mexico, and make this District a proper venue in which Plaintiff may file this lawsuit.

      4.     **Plaintiffs** are both employees and qualified individuals with a disability within the meaning of the FMLA, ADA, Sec. 504, HRA, and WPA, all as amended.

      5.     **Defendants**, New Mexico Highlands University (a/k/a New Mexico Normal University), the Board of Regents of New Mexico Highlands University (a/k/a The Board of Regents of New Mexico Normal University), are "persons" and "employers" within the meaning of the FMLA, ADA, HRA, "public employers" within the meaning of the WPA, and covered entities within the meaning of the ADA, Sec. 504, and the ADEA.

      6.     **Plaintiffs** are both persons with a disability and serious medical condition within the meaning of the HRA, the ADA, and Sec. 504, as both have mental and/or physical impairments that cause substantial limitations to major life activities.

      7.     Plaintiffs also have a record of disability and have been regarded as having a disability.

2

8.      Plaintiffs are both qualified within the meaning of the HRA, the ADA, and Sec. 504 as Ms. Bradley meets the requirements for the position of Coordinator of Disability Services and can perform the essential functions of this position, having been employed by Defendants for approximately one year, and as Dr. Alvarez meets the requirements for the position of Associate Professor of Sociology and Criminal Justice in the Department of Sociology, Anthropology and Criminal Justice and can perform the essential functions of this position, having been employed by Defendants for approximately 8 years.

*PLAINTIFF NATALIE BRADLEY*

9.      Defendants hired Ms. Bradley in January 2022, in a process that immediately displayed Defendants' conscious disregard for laws protecting persons with disabilities.

10.      The ADA prohibits making disability-related inquiries of a job candidate until after the employer has extended a formal offer of employment.  42 U.S.C. § 12112(d)(2); 29 C.F.R. §§ 1630.13(a), 1630.14(a),(b).

11.      Defendants sent Ms. Bradley a disability-accommodations form to complete **before** Defendants had made Ms. Bradley a formal job offer.

12.      Ms. Bradley did not receive a job offer from Defendants until a week later, assigning a official start date of February 7, 2022.

13.      The position of Coordinator of Disability Services is an administrative position without essential physical requirements. Ms. Bradley disclosed her disabilities to Defendants shortly after she was hired in early 2022 and requested reasonable accommodations thereafter.

14.      Two of Ms. Bradley's reasonable accommodations requests were granted but one was initially denied without explanation or invitation to engage in the interactive process. After approximately one month of challenging Defendants' denial and refusal to engage, Defendants

3

finally re-engaged with Ms. Bradley and approved the third request.

15.     The essential functions of Ms. Bradley's position are to: ensure Defendants' compliance with federal and state law regarding persons with disabilities; receive and process student requests for reasonable accommodations; provide advocacy and guidance to students with disabilities; and provide education regarding accessibility and disability services to students, staff and faculty.

16.     Much of Ms. Bradley's work as Coordinator of Disability Services included explicitly opposing, on behalf of students, practices on the part of faculty, staff and administrators that may amount to "unlawful discriminatory practice" under state law or "discrimination" under federal law.

17.     Beginning in late Summer and early Fall of 2022, Ms. Bradley began advocating for an increase to her department's budget to meet the needs of all students with disabilities on campus. Ms. Bradley was ultimately able to secure a significant increase to her department's budget, which ensured the provision of translation and interpretation services, assistive technology, and other services and supports students with disabilities are entitled to.

18.     During her push to increase her department's budget, Ms. Bradley was met with pushback and criticism from Defendants' administrators who were angered by her vocal opposition to their practices.

19.     In discharge of her essential job functions, Ms. Bradley also advocated on behalf of individual students for reasonable accommodations. As an example, Ms. Bradley advocated on behalf of students with blindness or other visual impairments who required course materials translated to braille. For this advocacy, Ms. Bradley received pushback from Defendants' faculty who did not want to assist in securing these accommodations and who interfered with both the

4

approval and implantation of these accommodations.  Dr. Gadsden and Dr. Jenkins became involved and made a complaint to Dr. Williamson about Ms. Bradley. In an attempt to resolve this issue and work collaboratively with faculty and staff, Ms. Bradley ended up meeting with Dr. Jenkins during the Summer of 2022 to discuss the issue and then sent a followup letter to both Dr. Gadsden and Dr. Jenkins memorializing the discussions regarding accommodations and asking them to encourage faculty members to contact her for support and assistance if any other instances of faculty concerns came up.  Despite Ms. Bradley's efforts to work with Dr. Gadsden and Dr. Jenkins in the Summer of 2022, inviting them that they could come to her again in the future for assistance and asking them to encourage instructors to do the same, in January 2023, Dr. Gadsden and Dr. Jenkins did not reach out to Ms. Bradley or try to resolve the issues they had directly with her. Instead, they did exactly as they had done before, and made another complaint to Ms. Bradley's supervisor regarding accommodation letters for the Spring 2023 semester.

20.     As another example, Ms. Bradley advocated on behalf of a student with a serious medical condition for accommodations/modifications in student meal plan policies, which also angered administrators such as Denise Montoya (who according to NMHU's website, was Director of Human Resources from 2015 through 2019, and who as of November 2022, was Associate Vice President for Finance, Administration, and Government Relations), who interfered with the approval of these accommodations.

21.     At the time of this incident, Ruth Mariampolski, NMHU Director of Compliance and Title IX Coordinator, acknowledged to Ms. Bradley that meal plan policies were within Ms. Bradley's job description.  But Ms. Mariampolski warned Ms. Bradley that Ms. Montoya was "anti-disability."  And Ms. Mariampolski further confided that although Ms. Montoya had been

removed from Human Resources, because there were so many problems, Ms. Montoya continued to supervise and direct Jill Diamond, who had nominally replaced Ms. Montoya in Human Resources.

22.     In addition, Ms. Bradley's supervisor, Ian Williamson, cautioned her that Ms. Montoya was politically powerful and that Ms. Bradley could expect to experience negative consequences.  In addition, after Ms. Bradley pointed out to Mr. Williamson that approving meal plans was in her job description, NMHU removed such duties from her job description, and Mr. Williamson informed Ms. Bradley that Ms. Montoya would be taking over such duties.

23.     The pushback against Ms. Bradley's advocacy in these examples and in other cases, ultimately led to what Ms. Bradley believes were threats and reprisals against her from Defendants and their faculty and administrators.

24.     On January 10-11, 2023, Ms. Bradley attended the NMHU President's Council for Diversity, Equity, and Inclusion retreat.  At this meeting, Ms. Bradley spoke out in support of Defendants' employees with disabilities and voiced her opposition to Defendants' practices regarding accessibility for employees.  Ms. Bradley voiced her concerns about the seeming lack of policies and procedures for employees with disabilities requesting reasonable accommodations, leading to significant delays or simply no response to requests.  Ms. Bradley spoke about the need for an ADA coordinator for employees who could implement policies and procedures and ensure that Respondents were acting in accordance with the ADA. Upon returning to campus the following week for the beginning of the Spring 2023 semester, Ms. Bradley learned from the Respondents' compliance officer, Ms. Mariampolski, that NMHU's liaison to the Higher Learning Commission (HLC) (the accrediting institution for colleges and universities in the United States), Keith Tucker, was present at the PCDEI retreat and approached

the compliance officer after the retreat to discuss some of the issues Ms. Bradley had raised at the retreat.  Ms. Bradley then reached out to Mr. Tucker via a phone call to tell him that she did not know that he was the was the liaison to HLC or that he would be taking her statements back to the Defendants' administration. Ms. Bradley also expressed concern to Mr. Tucker that Defendants might fire her for speaking out about these issues. Mr. Tucker confirmed that he had repeated Ms. Bradley's statements to members of the administration.

25.     In the days following this meeting, Ms. Bradley was advised by Defendants that she was required to request renewals for her own reasonable accommodations despite their being no issues with her work performance, or changes in her disabilities and serious medical condition at that time.

26.     During this time, Dr. Gadsden and Dr. Kathy Jenkins made another complaint about Ms. Bradley to her supervisor, Dr. Williamson, and then continued to raise their complaints at a faculty senate meeting.

27.     Throughout January 2023, Complainant experienced growing hostility in the workplace, which impacted her mental health adversely.

28.     After Dr. Gadsden had complained about Ms. Bradley regarding the accommodation request to convert documents for a blind student in the Spring of 2022, it seemed to Ms. Bradley that Dr. Gadsden was determined to oppose her whenever possible. For example, whenever Ms. Bradley wanted to implement a change to improve student accessibility to services for their disabilities, Ms. Bradley would get approval from Dr. Williamson, and then present about the change in faculty meetings. At these meetings, Dr. Gadsden frequently voiced opposition to changes proposed by Ms. Bradley.

29.     By the beginning of the Spring 2023 semester, Ms. Bradley was feeling

7

increasingly intimidated and unwelcome by Dr. Gadsden. Exhibit 1 at ,f31. On multiple

occasions in January of 2023, Ms. Bradley witnessed Dr. Gadsden standing and waiting in areas

near Ms. Bradley's office, seemingly watching her arrive or leave. Id. On these occasions, Dr.

Gadsden did not greet Ms. Bradley or approach her to discuss anything. Id. Dr. Gadsden

engaging in this behavior felt hostile to Ms. Bradley and she told a colleague who worked in the

ACCESS office with her about it. Id. This colleague offered to walk Ms. Bradley to her office

because of this and witnessed Dr. Gadsden engaging in this behavior. Id.; see also Exhibit 3.

30.    Also at the beginning of the Spring 2023 semester, Dr. Williamson told Ms.

Bradley that the university was making everyone renew telework contracts through HR.  He

notified Ms. Bradley that she would have to submit a telework request to HR.  Ms. Bradley

emailed HR to see how to proceed, and to determine what specific information HR was needing.

Jill Diamond responded to Ms. Bradley's email, copying Roberta Vigil.  Ms. Diamond told Ms.

Bradley that the telework agreement on file for her was effective until March 7, 2023, and if she

would be requesting to continue teleworking after March 7, 2023, she should fill out an

accommodation request form and include substantiating medical documentation.  When Ms.

Diamond told Ms. Bradley this, Ms. Bradley let her know that she was concerned about the

number of people who might have access to her medical information.  Ms. Bradley began

preparing the telework contract, but still sought information about who the ADA coordinator for

Respondents was because she wanted to be sure her information was being kept confidential.

31.    Ms. Bradley was also concerned about Dr. Montoya, having access to her

confidential information because Dr. Montoya had a previous confrontation with Ms. Bradley in

October of 2022.

32.    In mid-January 2023, Ms. Bradley's work environment had thus became hostile

and her condition (vis-a-vis her disabilities and serious medical condition) did change. Following the advice of her healthcare providers, Ms. Bradley requested temporary medically necessary leave. This request was made through the appropriate procedures; however, Defendant denied this request.

33.     Because of the events addressed above, specifically the multiple things that occurred in January of 2023, Ms. Bradley began feeling increasingly stressed, which triggered her asthma, and worsened her mental health.  Ms. Bradley was experiencing an increase in difficulty breathing, related to her asthma as well as anxiety and panic attacks. In mid-January, Ms. Bradley began working on getting medical appointments scheduled to address the changes to her mental health.  She secured two appointments for January 27, 2023, to address her physical and mental health and asthma concerns. Ms. Bradley communicated her need to take sick leave to attend these medical appointments to Dr. Williamson first by email, and then also by following up with a phone call.

34.     About a week after these events at the beginning of the Spring 2023 semester, on January 26th at 4:28 p.m., Ms. Diamond sent Ms. Bradley an email informing her that a meeting in HR was being scheduled for the following day, January 27th, at 1 :30 pm.  Ms. Bradley responded to Ms. Diamond's email at 4:34 pm, asking the purpose of the meeting, as well as informing Ms. Diamond that she already had a personal appointment scheduled from 1-2 pm on January 27th. Ms. Bradley asked Ms. Diamond to offer an alternative time for the meeting.  At 5:07 pm, Ms. Diamond responded that she would reschedule the meeting to 11 am for the following day instead, and said she would share the purpose of the meeting upon Ms. Bradley's arrival.

35.     On the morning of January 27, 2023, at 9:00 am, Ms. Bradley informed Ms.

Diamond that she was on sick leave that day to attend her two medical appointments and asked for the meeting to be rescheduled for the following week. (These were the appointments she had scheduled to seek treatment for her mental health as the stress she had been experiencing at work was triggering for her mental illness as well as her asthma.) About an hour later at 9:57 am, Ms. Bradley had just left her first medical appointment for the day and sent Ms. Diamond an email with the subject line reading, "Please see attached letter and please advise about FMLA process. Thank you."  The letter Ms. Bradley had attached was from her healthcare provider and dated 1/27/2023. The letter informed that Ms. Bradley was seen that morning, and would need to be excused from work to get "medical and psychological help ... to be able to function."  At 3:41 pm that afternoon, Ms. Diamond sent Ms. Bradley an email stating that the purpose of the meeting that had been scheduled for that day was to hand deliver a termination letter to Ms. Bradley. Ms. Diamond attached the letter to the email and instructed Ms. Bradley to return all NMHU property and retrieve any personal effects she had on campus.  The attached termination letter read that NMHU was exercising its right to terminate Ms. Bradley's employment during her probationary period.  Ms. Bradley had just seven business days left in her 12-month probationary period at the time of her termination.

36.     Defendants' termination notice thus simply justified Ms. Bradley's termination as an exercise of their right to terminate any employee during the employee's probationary period; a specific reason was not otherwise provided.

37.     In turn, Ms. Bradley alleges Defendants:

a.     aided, abetted, compelled or coerced the commission of unlawful discriminatory practice based on disability and serious medical condition;

10

      b.      engaged in threats and reprisals against her for her opposition of unlawful discriminatory practice based on disability and serious medical condition (on behalf of others and on behalf of herself);

      c.      Willfully obstructed and prevented her and others from complying with provision of the HRA and other state and federal laws;

      d.      retaliated against her by taking adverse employment actions against her;

      e.      denied requests for reasonable accommodations (including leave requests) and refused to engage in the interactive process to address any concerns with those requests; and

      f.      engaged in a pervasive pattern of harassment against her that fostered a hostile work environment.

38.      Ms. Bradley further asserts Defendants did the foregoing in violation of the HRA, the ADA, Sec. 504 and the ADEA, all as amended.

39.      In turn, Ms. Bradley, on June 12, 2023 filed a Charge of Discrimination with the New Mexico Human Rights Bureau, obtaining a Letter of Determination, which the Bureau purported to issue/place in the mail on February 20, 2024 (although Ms. Bradley did not, in fact, receive the letter until March 4, 2024).  On information and belief, EEOC has also issued its Notice of Rights to Sue on or after such date, making Ms. Bradley's complaint in this matter timely.

*PLAINTIFF REBECCA ALVAREZ*

40.      Dr. Alvarez resides in Santa Fe, New Mexico.  Dr. Alvarez has been employed by NMHU since 2010 and is currently an Associate Professor of Sociology and Criminal Justice in the Department of Sociology, Anthropology and Criminal Justice.  The position of Associate

Professor of Sociology and Criminal Justice in the Department of Sociology, Anthropology and Criminal Justice is an instructor position without essential physical requirements. Dr. Alvarez disclosed her disabilities to Defendants several times, including self-identifying as "on the spectrum" to Defendant Gadsden multiple times in 2018-2019; as neurodivergent (unspecified) to President Sam Minner in a Zoom meeting on October 13, 2023; as having a disability (non-specific) via PayCom (the online 3rd-party replacement for the Payroll Department) on October 31, 2023; and as neurodivergent with ADHD to Dr. Brandon Kempner in a meeting in his office in Douglas Hall on November 14, 2023.

41.     Despite these disclosures, rather than tolerating and accommodating Dr. Alvarez's status, Dr. Gadsden and NMHU harassed and discriminated against Dr. Alvarez and other NMHU staff who are either neurodivergent or have job duties to support such persons. And over the same period, Dr. Alvarez observed that NMHU's striking turnover in Human Resources (with departures of Jill Diamond, Mariama Whalen, and Kelly Barnes) and disability services (including, but not limited to, the termination or resignation of Ms. Bradley) suggests NMHU is shirking and, in fact, deliberately undermining its HR/disability functions. (Further, as referenced above, Ms. Bradley understood that the referenced Human Resources staff had been answering to Denise Montoya, despite her known hostility to disabilities and disability services.)

42.     Dr. Alvarez observed that from 2016-2022, Dr. Gadsden (whom NMHU later promoted to full Professor) and another full Professor in her department, Dr. Orit Tamir, together harassed 'disabled' and disability-services-providing staff. Dr. Alvarez was aware Ms. Bradley's job duties included facilitating/advocating for students who required disability accommodations. Dr. Alvarez understood NMHU either fired or caused Ms. Bradley to resign toward the end of the 2022-2023 Academic Year ("AY"). Dr. Alvarez also observed Ms. Bradley was one of four,

revolving disability service coordinators in the past few years.

43.     Dr. Tamir also harassed another openly neurodivergent faculty member, Dr.
Lewis Borck, who then left NMHU after only two years for another campus in Oklahoma,
despite his family still living in Albuquerque.   And during the Spring semester of 2022 (in
reference to the case of a blind student who was anticipated to enroll at that time, and who took
Dr. Alvarez's Introduction to Sociology course in Fall 2022), Dr. Tamir told Dr. Alvarez,
"Highlands isn't really equipped to handle ADA, anyway."

44.     Because of incidents such as these, at the beginning of AY 2022-2023 (August
26, 2022), Dr. Alvarez (along with most tenured/tenure-track members of her department) voted
not to nominate Dr. Tamir (who had retired) to the status of emeritus professor.  In the wake of
the vote, Dr. Alvarez commented to Dr. Gadsden that her own mental health would be better
without Dr. Tamir around.  Shortly thereafter, Dr. Gadsden seemed to mount a campaign of
harassment and discrimination toward Dr. Alvarez, aimed at elevating her anxiety level, and
causing her distress and deterioration of her mental health.

45.     Through the end of 2023, Dr. Gadsden's tactics ranged from ongoing aggressions
to more direct interference with Dr. Alvarez's job, including, but not limited to instances such as:

        a.      Late Fall Semester of 2022: Leaving Dr. Alvarez off the list of search
        committee members for the department's Archaeology position until Dr. Mario Gonzales
        requested Dr. Alvarez's instatement several times, resulting in her late addition to the
        committee on or around 2/9/2023. This recurred in Fall of 2023. This affected Dr.
        Alvarez performance evaluation in terms of service, a record used in evaluating
        promotion.

        b.      Between Fall 2022 and Fall 2023: Dr. Gadsden took away most of Dr.

13

Alvarez's advised students, which directly impacts Dr. Alvarez's performance evaluations on teaching and advising, a record used in evaluating promotion.

      c.      Fall Semester of 2023: Giving Dr. Alvarez a very negative performance evaluation, despite very positive evaluations of her other colleagues. This could lead to post-tenure review on the part of the University.

      d.      Fall Semester of 2023: Terminating Dr. Alvarez without cause as a reviewer from a journal of which Dr. Gadsden was the editor, within 3 hours of sending the negative evaluation on 9/29/2023. This affects Dr. Alvarez's performance evaluation in terms of scholarship, a record used in evaluating promotion.

      e.      Fall Semester of 2023 and ongoing: Giving all the other faculty members in the hallway where Dr. Alvarez's office was located a key but not giving Dr. Alvarez a key, so Dr. Alvarez was forced to ask Dr. Gadsden for access.  For an ongoing period thereafter, Dr. Alvarez did not have access to the hallway where her office is located unless someone else had propped the door open.  On October 2, 2023, Dr. Alvarez requested a key from Dr. Gadsden.  At that time, Dr. Alvarez saw Dr. Gadsden watching from the window of a conference room as Dr. Alvarez was unable to open the door and asked to be let in.  Dr. Gadsden said she had a key, then immediately contradicted herself and said that she did not have one, letting Dr. Alvarez into the hallway via a nearby classroom.  On November 8, 2023, Dr. Alvarez discovered Dr. Kimberly Munro and Dr. Thomas Brooks had received their keys to the same hallway before or at the beginning of the Fall semester.  This affected and still affects Dr. Alvarez's job performance in all areas, as she still does not have a hallway key, and without access to Dr. Alvarez's office, she cannot do her job.

f.      Late Fall Semester of 2023: Not giving Dr. Alvarez Fall Intersession work, which Dr. Alvarez had received in Fall of 2022.  This directly caused Dr. Alvarez a loss of $3,000 for a course contract.

g.      Fall Semester of 2023 and ongoing:  NMHU's website ceased displaying Dr. Alvarez's area (the Public Affairs-Applied Sociology program) as an option when students applied online for graduate programs—a process that uses the application Slate, which Kyana Cruz oversaw at the time.  This began on or by October 23, 2023, when Dr. Alvarez received an email from a graduate student attempting to apply for the Public Affairs-Applied Sociology program, who had been steered into the Public Affairs-History and Political Science program instead by the Slate system.  Dr. Alvarez emailed Kyana Cruz about this on October 27, 2023.  And the problem was ongoing thereafter for months.

46.      Other key administration staff have known of Dr. Alvarez's neurodivergence for an extended period and have continued to allow, to refrain from correcting, to ratify, and to condone Dr. Gadsden's behavior since well after NMHU knew or should have known of her wrongful conduct and prejudices.  For example, as the stress of Dr. Gadsden's behavior mounted, Dr. Alvarez was medically diagnosed with ADHD Inattentive Type on November 28, 2023; at that time began receiving treatment for the diagnosis; and on December 18, 2023 had specific workplace accommodations recommended by another physician.

47.      On December 31, 2023, Dr. Alvarez (through legal counsel) sent NMHU a written request:

a.      for physician-recommended accommodations to be granted pursuant to the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12112(b)(5)(A) and New Mexico Human Rights Act ("HRA") § 28-1-7(j) and § 28-1-2(v);

15

b.      for assurance that NMHU would protect Dr. Alvarez from any threat, reprisal, retaliation, or discrimination for this request and record of ADHD under ADA 42 U.S.C. § 12203 or HRA § 28-1-7(i)(2); and

c.      noting NMHU's striking HR turnover (with departures of Jill Diamond, Mariam Whalen, and Kelly Barnes) shows the University has no functioning department empowered to act on these matters.

*Howell Letter to Dr. Gonzales-Walker*, dated 12/31/2023.

48.      Dr. Alvarez sent this request to the Provost, Dr. Roxanne Gonzales-Walker, as well as to Dr. Peter Linder, Interim Dean, and Dr. Brandon Kempner, Past Dean.  But NMHU failed to take and unreasonably delayed action on Dr. Alvarez's concerns.

49.      While Dr. Gonzales-Walker eventually replied to Dr. Alvarez's counsel's December 31, 2023 letter, that reply did not come until January 9, 2024 and only stated NMHU had "forwarded" Dr. Alvarez's requests to "HR" (with no individual specified).

50.      On January 10, 2024, Dr. Alvarez's counsel replied to Dr. Gonzales-Walker:

a.      noting NMHU had not identified a point of contact in HR for Dr. Alvarez to continue discussing her concerns;

b.      reporting that since Dr. Alvarez's first letter, NMHU had failed to accommodate and harassed Dr. Alvarez. Dr. Gloria Gadsden had scheduled department meetings (where Dr. Alvarez was to produce a department report on the prior graduate council meeting) to occur just 30 minutes after said graduate council meeting. Dr. Gadsden had recently refused to record the meeting or provide Dr. Alvarez the recording. And this was striking, considering Dr. Alvarez had for some time been on record with NMHU (and Dr. Gadsden) as neurodivergent; Dr. Alvarez had requested this accommodation in the past; Dr. Gadsden had previously complied for a time; and Dr. Gadsden had only ceased after one such recording captured her making false claims to the Faculty Senate;

c.      noting that this was also troubling, because of Dr. Gadsden having authority over Dr. Alvarez; Dr. Gadsden's history of aggression against Dr. Alvarez (as referenced above); other neurodivergent employees having been harassed and forced out (as referenced above); recent NMHU HR/disability-services attrition (as referenced above); concerns Dr. Gadsden has outsized actual or perceived authority over new HR staff lacking time or stature at NMHU; and circumstances suggesting Dr. Gadsden is influencing IT and admissions (as referenced above, with NMHU online systems having removed enrollment links to allow students to apply for the graduate program Dr. Alvarez coordinated:  Public Affairs-Applied Sociology); and

d.      for the above reasons, again asking NMHU to assure me it would

accommodate me, investigate the above concerns, and stop the harassment and interference from Dr. Gadsden.

*Howell Letter to Gonzales-Walker*, dated 01/10/2024.

51.     On January 11, Dr. Gonzales-Walker replied to Dr. Alvarez's counsel:

a.     naming Roberta Vigil as the HR representative assigned to Dr. Alvarez's accommodation request;

b.     stating Ms. Vigil would process my accommodation request and contact Dr. Alvarez for any necessary information;

c.     claiming "HR" was unaware of Dr. Alvarez's status or any need for accommodations; and

d.     claiming NMHU had been "unable" to otherwise address Dr. Alvarez's letters and concerns before January 11th.

52.     The same day, Dr. Alvarez's counsel replied to Dr. Gonzales-Walker.  Regarding

NMHU's claim that HR had nothing "on file" for Dr. Alvarez, Mr. Howell:

a.     reiterated that Dr. Alvarez had had concern with NMHU's HR and disability-services staffing, tolerance, and handling of neurodivergent employees;

b.     noted (as referenced above) Dr. Alvarez had thus/still self-identified as "on the spectrum" to Dr. Gloria Gadsden multiple times in 2018-2019; as neurodivergent (unspecified) to President Sam Minner in a Zoom meeting on October 13, 2023; as having a disability (non-specific) via PayCom (the online 3rd-party replacement for the Payroll Department) on October 31, 2023; and as neurodivergent with ADHD to Dr. Brandon Kempner in a meeting in his office in Douglas Hall on November 14, 2023;

c.     noted EEOC's Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act recognizes oral, unwritten reporting to any supervisor or manager puts the employer on notice of a disability and, itself, should prompt the employer to initiate an interactive process;

d.     noted ADA-trained supervisors should have made HR aware of such notices and—in any event—refrained from discrimination or retaliation around such neurodivergence; and

e.     based on the above, reiterated that Dr. Alvarez had "for some time been on record with NMHU as neurodivergent."

*Howell Letter to Gonzales-Walker*, dated 01/11/2024.

53.     For the next two weeks, NMHU:

a.     made no response to Dr. Alvarez's counsel;

b.     did not answer whether it would grant Dr. Alvarez's physician-recommended accommodations;

  c.  made no contact with Dr. Alvarez to investigate or obtain details on her allegations of harassment;

  d.  continued withholding assurances of protection from retaliation or interference;

  e.  in fact, continued not accommodating Dr. Alvarez; and

  f.  in fact, continued to subject Dr. Alvarez to Dr. Gadsden's harassment.

54.  In turn, on January 25, 2024, Dr. Alvarez's counsel wrote to Dr. Gonzales-Walker, stating:

> To date neither Human Resources nor the administration has answered whether NMHU will provide Dr. Alvarez's requested accommodations.  Nor has there been a reply or inquiry one could fairly call "interactive process" under the ADA or HRA.
>
> It is nearly a month since Dr. Alvarez made the requests to you in writing on December 31, 2023.  It is also months since Dr. Alvarez made such oral requests to Dr. Gadsden.
>
> An employer should reply promptly to a request for reasonable accommodation. *See* EEOC's Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act.  If the employer needs to engage in an interactive process, this too should proceed as quickly as possible. *Id.*; *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 677, 7 AD Cas. (BNA) 1872, 1880 (7th Cir. 1998).  And the employer should act promptly to provide the accommodation.  *Id.*  Unnecessary delays can result in a violation of the ADA.  *Id.* ("In determining whether there has been an unnecessary delay in responding to a request for reasonable accommodation, relevant factors would include: (1) the reason(s) for the delay, (2) the length of the delay, (3) how much the individual with a disability and the employer each contributed to the delay, (4) what the employer was doing during the delay, and (5) whether the required accommodation was simple or complex to provide").
>
> Here, the delay is inexplicable.  The requested accommodations are simple and cost-free.  And as previously noted, as recently as the Fall semester, Dr. Gadsden was making and giving Dr. Alvarez access to recordings of the referenced meetings.
>
> Meanwhile, Dr. Gadsden is harassing Dr. Alvarez in the same, continuing manner.  A Faculty Senate meeting took place on January 24, after which Dr. Alvarez was not provided a recording, despite Dr. Gadsden requiring her to provide a report back to her department on Faculty Senate matters.  Further, a meeting for the Graduate Council on which Dr. Alvarez sits was scheduled within thirty minutes of her department's meeting on January 26.  And Dr. Gadsden, who

is both Department Chair and Chair of Graduate Council, has not advised whether Dr. Alvarez will receive a recording of this meeting.

Without immediate response and compliance by NMHU, we will deem further dialogue futile. *See Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999) (citing *International Bhd. Of Teamsters v. United States*, 431 U.S. 324, 366 (1977)). Please meet your legal obligations immediately, or we will have no choice but to proceed with Charges at the Equal Employment Opportunity Commission and New Mexico Human Rights Bureau.

Howell Letter to Gonzales-Walker, dated 01/25/2024.

55.     In response to this letter, NMHU finally had an outside attorney, Patricia Ives,

reply on January 25, 2024 as follows:

I represent NMHU and am working with your request on behalf of Associate Professor Alvarez. I intend to respond to that request this afternoon or tomorrow. Please communicate directly with me not with Dr. Gonzales Walker, Dr. Kempner, Dr. Linder or Ms. Vigil.

*Ives Email to Howell*, dated 01/25/2024.

56.     But despite this commitment, Ms. Ives' next communication (January 26, 2024):

a.     still did not answer whether NMHU would grant Dr. Alvarez the physician-recommended accommodations;

b.     only stated NMHU was "looking into the reasonableness" of the accommodations; and

c.     with respect to Dr. Alvarez's allegations of harassment, only stated "NMHU will initiate an investigation into these allegations and will be in touch with Dr. Alvarez concerning the investigation."

*Ives Email to Howell*, dated 01/26/2024.

57.     And despite even those claims, for the next two weeks, no one from NMHU ever

got "in touch" with Dr. Alvarez concerning the supposed investigation.

58.     And meanwhile, Defendants expanded efforts to undermine Dr. Alvarez.

59.     On January 25, 2024, Dr. Alvarez received the following email from a graduate

student in Dr. Gadsden's program, which read in part:

I would like to be added to your sociology course 5160, Organized Crime. I had emailed

my coordinator to see if your other course, CJUS 4130, would be acceptable to add on Tuesday. However, since I never heard back, I missed the deadline to add a course.

60.     On January 27, 2024, Dr. Alvarez held a meeting with a student at the student's request who had previously as an undergraduate told Dr. Alvarez she was interested in applying to the Public Affairs-Applied Sociology program.  When Dr. Alvarez asked the student "What happened with Applied Sociology?," the student responded, "I was going to apply to Public Affairs, but then Dr. Gadsden talked me into going into Psychology instead."  (Psychology is not part of the department of Sociology, Anthropology, and Criminal Justice, but Public Affairs-Applied Sociology is.)  The student, a graduate student, claimed she had also been talked by Dr. Gadsden into applying to her online Criminology program for a second Master's degree.  This directly impacts enrollments in the Public Affairs-Applied Sociology MA program, which in turn impacts Dr. Alvarez's performance evaluations on teaching and advising, a record used in evaluating promotion.

61.     Later, Ms. Ives finally wrote to Dr. Alvarez's counsel, claiming "NMHU will provide Dr. Alvarez the requested accommodations."  *Ives Email to Howell*, dated 01/29/2024.

62.     Dr. Alvarez's counsel replied with thanks, while also repeating Dr. Alvarez's requests for:

> a.     the assurance requested on December 31st that Dr. Alvarez will be protected from any threat, reprisal, retaliation, or discrimination for her accommodation requests and record of ADHD;
> b.     the status of investigation and any corrective action on matters we raised in our January 10th correspondence; and
> c.     the assurance we requested on January 10th that NMHU will stop the harassment and interference from Dr. Gadsden.

*Howell Email to Ives*, dated 01/30/2024.

63.     But thereafter, NMHU continued only delayed, sporadic communication (such as Ms. Ives' February 5, 2024 email, claiming "we are in the process of retaining an investigator"),

while not giving or following through on assurance of an actual investigation and protection

from discrimination and retaliation.

64.     Through mid-February 2024, (30+ days after Dr. Alvarez's January 10, 2024

report of harassment and discrimination to NMHU Provost Gonzalez-Walker), NMHU had not

so much as named the HR rep or supposed "investigator" assigned to Dr. Alvarez's allegations.

And no HR rep or investigator had contacted Dr. Alvarez for an interview or information.

65.     In turn, on February 11, 2024, Dr. Alvarez electronically filed a *Charge of

Discrimination* with the New Mexico Human Rights Division and the United States Equal

Employment Opportunity Commission, substantially recounting the above matters.  And

simultaneously, Dr. Alvarez provided Defendants' attorney, Patricia Ives, a copy of the same.

66.     Yet the above harassment continued and in increased after Defendants' receipt of

Dr. Alvarez's NMHRB/EEOC Charge.

67.     Defendants continued (and continue) to schedule Department meetings within 30

minutes of the Graduate Council meetings.

68.     Defendants have still not provided Dr. Alvarez with recordings that are being

made of the Graduate Council meetings.

69.     Defendants still are not recording Faculty Senate meetings.

70.     And because of ongoing obstruction and non-cooperation from Dr. Gadsden, Dr.

Alvarez has resigned her position as Program Coordinator for the Public Affairs-Applied

Sociology MA program.

*AS TO BOTH PLAINTIFFS*

71. Under HRA and WPA, Defendants retaliated against Plaintiffs because:

a.      under HRA, Plaintiffs by the same actions and by their protests against the

21

other, above treatment "opposed any unlawful practice … testified or participated in" a proceeding under HRA, for which they were entitled to protection against "any form of threats, reprisal or discrimination" pursuant to NMSA § 28-1-7(I)(2); and

b.      under WPA, Plaintiffs suffered retaliation as a direct result of engaging in protected activity, making good-faith protests, lawfully defending themselves, and invoking clear, legal rights, against Defendants' acts of discrimination and retaliation.

## ADDITIONAL JURISDICTION FACTS

72.    NMHU is a state educational institution and agency, created by Constitution and statute. *See* N.M. Const., art. XII, § 11, as repealed and reenacted on November 8, 1960 (changing the name of New Mexico Normal University to New Mexico Highlands University); 21-3-2 NMSA 1978.

73.    NMHU is Plaintiffs' "employer" as defined by HRA, NMSA § 28-1-2(B) and (A), as well as a "public employer" as defined by WPA, NMSA § 10-16C-2(C).

74.    Dr. Gadsden is an administrative head of NMHU and a "person acting for [Plaintiff's] employer" as defined by HRA, NMSA § 28-1-2(B) and (A), as well as an "officer" of a "public employer" as defined by WPA, NMSA § 10-16C-2(C).  As such, Defendant Gadsden is amenable to suit and joinder as a defendant to each cause of action.

75.    Defendant NMHU at all relevant times was an agency of the State of New Mexico; can be sued pursuant to § 10-16C-4 NMSA 1978 and § 4-46-1 NMSA 1978; and— along with its employees, including Dr. Gadsden.

76.    The unlawful employment and whistleblower retaliation against Plaintiffs alleged herein were committed by Defendants on dates from 2022 through May 20, 2024 in the State of New Mexico, thereby making this action timely, and conferring jurisdiction over the parties and

subject matter hereto in this Court.

77.     The statutory claims asserted herein under HRA, and WPA are not subject to the New Mexico Tort Claims Act ("NMTCA"), which was enacted in 1976.

78.     Amended several times since 1976, by a legislature fully aware of the existence of NMTCA, HRA is an express legislative waiver of the partial immunity otherwise created by the NMTCA.

79.     HRA defines its covered employers to include "any person employing four or more persons and any person acting for an employer" and defines "person" to include "the state and all of its political subdivisions."  *See* §28-1-2 (A) and (B) NMSA 1978.

80.     In addition, while setting forth the process by which an aggrieved person may appeal any administrative determination to the district court, HRA dictates "the state shall be liable the same as a private person."  *See* §28-1-13 (D) NMSA 1978.

81.     Finally, enacted in 2010, by a legislature fully aware of the existence of NMTCA, WPA is an express legislative waiver of the partial immunity otherwise created by the NMTCA.

82.     WPA not only defines its covered employers to include public employers; the entire statute is expressly limited to public employers.  *See* § 10-16C-2 (C) NMSA 1978.  That is, the entire purpose and effect of WPA is to create specific liability of public employers in waiver of prior NMTCA immunity.

83.     Pursuant to the New Mexico Supreme Court decision in *Luboyeski v. Hill*, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994), NMTCA does not supersede or override WPA.

84.     Nevertheless, pursuant to § 4-46-1 (A) NMSA 1978, Defendants had both "actual notice" and "written notice" of the occurrence giving rise to this Complaint within less than 90 days of said occurrences.

85.     Plaintiffs have satisfied all preconditions that would otherwise apply to sue under the NTCA, § 4-46-1 (A) NMSA 1978.

c.       In compliance with HRA and ADA, Plaintiffs have also initiated with New Mexico Human Rights Bureau ("HRB") and EEOC timely Charges of Discrimination, pursuant to NMSA § 28-1-10(A); and prior to the expiration of 90 days from the date of service of EEOC's and HRB's orders/notice of rights to sue, filed this Complaint/Notice of Appeal in the district court of the county where some of the discriminatory practices occurred and where Defendants do business, pursuant to NMSA § 28-1-13(A).

86.     Pursuant to the WPA, NMSA §10-16C-6, Plaintiffs timely filed this Complaint prior to the expiration of two years from the date on which the retaliatory actions occurred.

87.     The court further has jurisdiction over the parties and subject matter pursuant to HRA, NMSA § 28-1-13(A), WPA, §10-16C-4 NMSA 1978, and Article VI, §13 of the Constitution of the State of New Mexico.

CAUSES OF ACTION

COUNT I
FMLA DISCRIMINATION & RETALIATION/
INTERFERENCE WITH EXERCISE OF RIGHTS

88.     Plaintiffs repeat and reallege the preceding allegations as though again herein fully set forth.

89.     NMHU is an "employer" within the meaning of 29 U.S.C § 2611(4).

90.     NMHU was, or acted directly or indirectly in the interest of, Ms. Bradley's "employer" within the meaning of 29 U.S.C § 2611(4)(a).

91.     NMHU was engaged in commerce or in any industry or activity affecting commerce within the meaning of 29 U.S.C § 2611(4)(a).

24

92.     NMHU employed 50 or more employees for each working day during 20 or more calendar workweeks in 2022 or 2023 within the meaning of 29 U.S.C § 2611(4)(a).

93.     Ms. Bradley was and is otherwise qualified to perform the essential functions of her position.

94.     At the time Defendants terminated Ms. Bradley had a "serious health condition" under 29 U.S.C § 2611(11).

95.     On January 27, 2023, Ms. Bradley was an "eligible employee" within the meaning of 29 U.S.C § 2611(2).

96.     As of January 27, 2023, Ms. Bradley was just days shy of being employed at least 12 months by Defendants within the meaning of 29 U.S.C § 2611(2).

97.     As of January 27, 2023, Ms. Bradley had at least 1, 250 hours of service for Defendants during the previous 12-month period within the meaning of 29 U.S.C § 2611(2).

98.     As of January 27, 2023, Ms. Bradley was just days from being entitled to, and had not exhausted, 12 workweeks of leave pursuant to 29 U.S.C § 2612(a)(1).

99.     As of January 27, 2023, Ms. Bradley had given advance notice to her employer that she was seeking FMLA paperwork to request future, additional days of leave pursuant to 29 U.S.C § 2612(a)(1).

100.     Because the FMLA requires an employee to provide his employer "not less than 30 days' notice" before taking leave for foreseeable medical treatment, 29 U.S.C. § 2612(e)(2), giving such notice reasonably must be and is "protected activity" for purposes of an FMLA retaliation claim. *See Wehrley v. Amer. Fam. Mut. Ins. Co.*, No. 12-1079 (10th Cir. January 3, 2013) (citing *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1276 n.8 (11th Cir. 2012); *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009); *Skrjanc v.*

*Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001) ("The right to take . . . leave pursuant to the FMLA includes the right to declare an intention to take such leave in the future.")).

101.    Defendants interfered with, restrained, and denied Ms. Bradley's exercise of and attempt to exercise FMLA rights within the meaning of 29 U.S.C § 2615.  Ms. Bradley suffered tangible, adverse employment actions, including but not limited to that Defendants terminated the employment of Ms. Bradley on January 27, 2023.

102.    On such bases, Defendants committed:

a.     interference with Ms. Bradley's exercise of FMLA rights in violation of 29 U.S.C § 2615(a)(1); and

b.     discrimination against Ms. Bradley in violation of 29 U.S.C § 2615(a)(2).

103.    Under 29 U.S.C § 2617, Defendants are liable to Ms. Bradley:

c.   for damages equal to—

i.     the amount of any wages, salary, employment benefits, or other compensation denied or lost to Ms. Bradley by reason of the violation

ii.     the interest on the amount described in clause (i) calculated at the prevailing rate;

iii.     an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii);

d.     for such equitable relief as may be appropriate, including employment, reinstatement, and promotion; and

e.     reasonable attorney fees, and litigation costs including but not limited to expert fees.

104.    Pursuant to 29 U.S.C § 2617(c), this action has been brought less than 2 years after July 29, 2016—the date on which NMHU terminated Ms. Bradley.

COUNT II –DISABILITY/SERIOUS MEDICAL CONDITION
DISCRIMINATION AND RETALIATION

105.    Plaintiffs repeat and reallege the preceding allegations as though again herein fully set forth.

106.    In violation of the ADA, 42 U.S.C. § 12203(a) and (b), and New Mexico Statutes § 28-1-7 (A), (I)(1), and (I)(2), Defendants engaged in an unlawful discriminatory practice in matters of compensation, terms, conditions, and privileges of employment (including pay, prestige, and treatment, a hostile work environment, demotion, and actual or constructive termination of employment) against persons otherwise qualified because of disability; coerced, intimidated, threatened, or interfered with Plaintiffs in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged any other individual in the exercise or enjoyment of ADA and NMHRA rights; and engaged in, aided, abetted, incited, compelled and/or coerced forms of threats, reprisal, retaliation against Plaintiffs for having "opposed [an] unlawful discriminatory practice" with respect to the same conduct by Defendants.

107.    The supposed non-discriminatory reason Defendants have offered for terminating Ms. Bradley and for mistreating Dr. Alvarez are a mere pretext for discrimination, as evidenced by facts that:

    a.    Defendants never viewed, identified, or escalated any purported concerns with Plaintiffs as matters warranting discipline until after Plaintiff began advocating for disability rights and complaining of mistreatment, *see Metzler v. Fed. Home Loan Bank*,

464 F.3d 1164, 1174 (10th Cir. 2006) (explaining that "evidence of pretext may include [evidence of an employer's] prior treatment of plaintiff");

   b.  Defendants' purported justification for discipline and mistreatment rely upon false accusations and false descriptions of conduct, *see Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (a plaintiff my prove pretext by producing evidence that "the defendant's stated reason for the adverse employment action was false,"); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (from the falsity of Defendants' explanation, the Court "can reasonably infer . . . that [Defendants are] dissembling to cover up a [retaliatory] purpose");

   c.  even if it there were any accuracy in the allegations, the conduct alleged against Plaintiffs did not amount to a violation of the severity Defendants claim, let alone grounds for mistreatment or termination, *see Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("The relevant "falsity" inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination");

   d.  Defendants have knowingly omitted context of events to cast Plaintiffs in a false, negative light, *see Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (finding fundamental unfairness and inadequacy of employer's investigation—including the decision makers deliberately preventing plaintiff from defending his actions and reaching their conclusions based on one-sided information—permitted jury to infer pretext and precluded summary judgment);

e.      Defendants gave inconsistent, changing explanations for what the adverse actions against Plaintiffs would be and for why it was justified, *see Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) ("An employee may show pretext based on `weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief.");

f.      Defendants have not articulated a fixed, objective standard under which they found Plaintiffs deserved mistreatment, discipline, or termination, more than other employees, see *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001) ("A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion.") (quoting *Chapman v. Al Transport*, 229 F.3d 1012, 1033-34 (11th Cir. 2000)) (emphasis added);

g.      however Defendants may phrase the standard of conduct, under that standard, they treated other employees more favorably than Plaintiffs, *see Sonntag v. Shaw*, 22 P.3d 1188, 1203 (N.M. 2001) (acknowledging that a "jury can properly infer the ultimate fact of intentional discrimination from disparate treatment");

h.      the apparent reasons Defendants treated other employees more favorably are that they are persons who have not advocated for Defendants to comply with disability laws including NMHRA, ADA, and Sec. 504, *see Kendrick*, 220 F.3d at 1230 (explaining that, to prove pretext through evidence of deviation of an unwritten company policy or practice, a plaintiff often provides evidence that she was treated differently from other similarly-situated employees who violated work rules of comparable seriousness);

     j.     Defendants violated their own HR policies, because Defendants:

        i.     did not investigate Plaintiffs' complaints at all;

        ii.     did not receive, document, process, investigate, or resolve

Plaintiffs' complaints through neutral, unbiased, disinterested persons—even after

Plaintiffs, through counsel, made such reports in writing;

        iii.     retaliated against Plaintiffs for invoking the complaint process; and

        iv.     attempted to intimidate Plaintiffs from further complaints;

*See Kendrick*, 220 F.3d at 1230 (explaining that a plaintiff can demonstrate pretext by

presenting (1) evidence that the defendant acted contrary to a written company policy

prescribing the action to be taken by the defendant under the circumstances or (2)

evidence that the defendant acted contrary to an unwritten policy or contrary to company

practice when making the adverse employment decision affecting the plaintiff); *Twigg v.*

*Hawker Beechcraft Corp.*, 659 F.3d 987, 1003 (10th Cir. 2011) ("deviation" evidence can

"permit[] a reasonable inference that [the employer] acted with an ulterior motive and . . .

engineered and manufactured the reasons [it] proffered for terminating [the employee's]

employment.'") (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1138 n.11

(10th Cir. 2003));

     k.     while doing so, and in stark contrast, Defendants engineered, exaggerated,

solicited complaints and statements to manufacture and magnify, categorically credited,

withheld notice from Plaintiffs of, and proceeded to take corrective action based upon

(before giving Plaintiffs any opportunity to address) any possible insinuation of

misconduct by Plaintiffs.  *See Kendrick*, *supra*; *Twigg*, *supra*; and

     l.     Regardless whether it conformed to their own policies, Defendants'

conduct did not apply or comply with generally accepted human resources practices. *See Maller v. Community College of Beaver County*, 43 F.Supp.3d 495, 513 (W.D. Penn. 2014) (finding genuine issue of material fact as to pretext based on expert testimony that employer did not conduct its purported restructuring plan in accordance with "standard human resources standards"); *Ferretti v. Pfizer, Inc.*, No. 11-CV-04486 (N.D. Cal. January 10, 2013); available at https://scholar.google.com/scholar_case?case=17748243018221683134&q=ferretti+v+pfizer+inc&hl=en&as_sdt=6,32 (allowing expert testimony and finding genuine issue of material fact as to pretext on whether employer complied with "generally accepted human resources practices"); and *Hernandez v. City of Vancouver*, No. CO4-5539FDB, 2009 WL 279038 (W.D. Wash. Feb. 5, 2009) (allowing expert testimony "as to proper governance standards" and "the City's deviation from good human resources practices" because it was relevant and "could assist the jury because the average juror is unlikely to be familiar with human resources management policies and practices."); *Smothers*, *supra* (finding fundamental unfairness and inadequacy of employer's investigation—including the decision makers deliberately preventing plaintiff from defending his actions and reaching their conclusions based on one-sided information—permitted jury to infer pretext and precluded summary judgment).

m.     Even if ultimate decisionmakers were neutral toward Plaintiff on the basis of disability/disability-advocacy (which Plaintiffs deny), their adverse/discipline/termination decisions rested on persons exhibiting hostility toward Plaintiffs on that basis, thus permitting—under the "Cat's Paw" doctrine—a jury to infer Defendants' termination was tainted by the discriminatory/retaliatory animus of Gadsden

and direct subordinates to Gadsden, on whose reports Defendants relied, and thus also permitting a finding that the proffered reason for acting against and/or firing Plaintiffs is pretextual.  *See E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006) (""In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.")

108.    Under New Mexico Statutes § 28-1-13, Defendants are liable to Plaintiffs for their resulting compensatory damages, including but not limited to back pay, front pay, employee benefits, and emotional distress, and for reasonable attorney fees, and litigation costs including but not limited to expert fees.

## COUNT III – WPA RETALIATION

109.    Plaintiffs repeat and reallege the preceding allegations as though again herein fully set forth.

110.    Plaintiffs by the above complaints and opposition to Defendants' NMHRA, ADA, and Sec. 504 violations:

A.      communicate[d] to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act;

B.      provide[d] information to, or testifie[d] before, a public body as part of an investigation, hearing or inquiry into an unlawful or improper act; **and**

C.      object[ed] to or refuse[d] to participate in an activity, policy or practice that constitutes an unlawful or improper act.

*See* §10-16C-2 (C)(3) NMSA 1978.

111.    The disability-related conduct of Defendants upon which Plaintiffs advocated,

reported, and complained constituted reasonably-perceived "unlawful or improper acts" within the meaning of WPA, because they involved "a practice, procedure, action or failure to act on the part of a public employer" that:

> (1)     violates a federal law, a federal regulation, a state law, a state administrative rule or a law of any political subdivision of the state;
>
> (2)     constitutes malfeasance in public office; or
>
> (3)     constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public.

*See* §10-16C-2 (E) NMSA 1978.

112.     Defendants took retaliatory actions against Plaintiffs for these reports in the form of a hostile work environment, demotions, actual and/or constructive termination of Plaintiffs' employment.  *Lerma v. N.M. Dep't of Corrections*, 2024-NMCA-011, *cert. granted* ("Our Legislature has defined 'retaliatory action' broadly as 'any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment'") (citing § 10-16C-2(D) NMSA); *Dart v. Westall*, 2018-NMCA-061, ¶ 23, 428 P.3d 292 (concluding the evidence sufficed to support a jury finding of "retaliatory action" under the NMWPA where the defendant reassigned the plaintiff to a new division, "created a hostile work environment, made humiliating comments about him to his colleagues, issued him a substandard work vehicle, and required him to surrender his key to the forensic lab and cease investigating his caseload of crimes against children").

113.     On such bases, Defendants committed whistleblower retaliation in violation of New Mexico Statutes § 10-16C-3.

114.     Under New Mexico Statutes § 10-16C-4, Defendants are liable to Plaintiffs for actual damages, including but not limited to back pay, front pay, lost employee benefits

including but not limited to retirement benefits under the Public Employees Retirement Association, and emotional distress, reinstatement to the position and seniority status Plaintiffs would have had but for the violation, two times the amount of back pay with interest on the back pay, compensation for special damages including emotional distress sustained as a result of the violation, and litigation costs and reasonable attorney fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court order as to their claims for violations of FMLA, ADA, NMHRA, and WPA, that Plaintiffs be awarded damages, including but not limited to unpaid or underpaid wages; back and front pay and benefits; pre- and post-judgment interest as permitted by law; emotional distress; additional liquidated damages in the amount of the same foregoing; costs and reasonable attorneys' fees; damages under NMSA §10-16C-4(A) including actual damages, reinstatement, two times the amount of back pay, interest on the back pay, special damages including emotional distress and associated medical bills; and the same and further common-law damages pursuant to NMSA §10-16C-4(C); costs and attorney fees pursuant to NMSA §10-16C-4(A); and any such other and further relief as the Courts deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.

Filed this <u>20th</u> day of May, 2024.

Respectfully Submitted,

*-/s/ - Trent A. Howell –*
*Electronically filed & signed-*
Attorney Trent A. Howell
P.O. Box 2304
Santa Fe, New Mexico  87504
trent@trentahowell.com
(505) 919-9158

*Counsel for Plaintiffs*