## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

NATALIE BRADLEY and REBECCA
ALVAREZ,

        Plaintiffs,

vs.                                 Civ. No.  24-cv-00497

NEW MEXICO HIGHLANDS UNIVERSITY,
BOARD OF REGENTS OF NEW MEXICO
HIGHLANDS UNIVERSITY (A/K/A THE
BOARD OF REGENTS OF NEW MEXICO
NORMAL UNIVERSITY), GLORIA GADSDEN,
and JILL DIAMOND.

        Defendants.

### FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FAMILY MEDICAL LEAVE ACT, AMERICANS WITH DISABILITIES ACT, SECTION 504 OF THE REHABILITATION ACT OF 1973, HUMAN RIGHTS ACT, AND WHISTLEBLOWER PROTECTION ACT

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), Plaintiffs Natalie Bradley ("Ms. Bradley") and Rebecca Alvarez ("Dr. Alvarez"), through counsel, Trent A. Howell, bring this First Amended Complaint against New Mexico Highlands University ("NMHU"), Board of Regents of New Mexico Highlands University (a/k/a the Board of Regents of New Mexico Normal University) ("Regents"), Gloria Gadsden ("Dr. Gadsden"), and Jill Diamond ("Ms. Diamond").

### SUMMARY OF CLAIMS AND KEY FACTS

1.     This action is brought within the Court's federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367 for redress of Defendants' violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*., Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq*., as amended by the ADA

Amendments Act of 2008, Section 504 of the Rehabilitation Act of 1973 (Section 504), 29

U.S.C. § 701 *et seq*., New Mexico Human Rights Act (HRA), NMSA § 28-1-1, *et. seq*., and New

Mexico Whistleblower Protection Act (WPA), NMSA § 10-16C-4 NMSA 1978, *et seq*.

  2. Defendants' violations arise from a common nucleus of operative facts, in which

they resisted accommodation of, harassed, discriminated, retaliated against, and terminated Ms.

Bradley from employment effective January 27, 2023, and resisted accommodation of, harassed,

discriminated, and retaliated against Dr. Alvarez and other staff and students from October 2022

to present, based on serious health/medical condition, disability, and opposition/participation acts

in which Plaintiffs asserted their own and others rights as employees, students, and/or persons

accessing public accommodations of or receiving services or participating in programs provided

by NMHU as a governmental entity and recipient of federal funds.

  3. Venue is appropriate because the actions complained of are conduct and

employment practices of Defendants, who operate and employed Plaintiffs within the District of

New Mexico, subject to the employment laws of the State of New Mexico.  28 U.S.C. § 1391.

And such actions subject Defendants to the personal jurisdiction of the District of New Mexico

as to this civil action.  *Id*.

  4. The facts above and herein make this action timely, confer jurisdiction over the

parties and subject matter hereto in the District of New Mexico, and make this District a proper

venue in which Plaintiff may file this lawsuit.

  5. Plaintiffs are both employees (Ms. Bradley as a former Coordinator of Disability

Services, and Dr. Alvarez as a current Associate Professor of Sociology and Criminal Justice in

the Department of Sociology, Anthropology and Criminal Justice) and qualified individuals with

a disability within the meaning of the FMLA, ADA, Section 504, HRA, and WPA.

2

6.      **Defendants** NMHU and Regents are a "program or activity" within the meaning of Section 504, 29 U.S.C. § 794(b)(2); "receiving federal financial assistance" within the meaning of Section 504, 29 U.S.C. § 794(a); "persons" and "employers" within the meaning of FMLA, 29 U.S.C § 2611(4), ADA, 42 U.S.C § 12111(5), Section 504, 29 U.S.C. § 791(f), HRA, NMSA § 28-1-2(B) and (A); "public employers" within the meaning of WPA, NMSA § 10-16C-2(C); a "public accommodation" within the meaning of HRA, NMSA § 28-1-2(h) and NMSA § 28-1-7(f); a "governmental entity" within the meaning of HRA, NMSA § 28-1-2(bb) and (cc) and NMSA § 28-1-7(m); and covered entities within the meaning of the FMLA, ADA, 42 U.S.C § 12111(2), Section 504, HRA, and WPA.

7.      Defendants Dr. Gadsden and Ms. Diamond are "persons" and "employers" within the meaning of FMLA, 29 U.S.C § 2611(4), and HRA, NMSA § 28-1-2(B) and (A).

8.      **Plaintiffs** are both persons with a disability and serious health/medical condition within the meaning of the FMLA, 29 U.S.C § 2611(11), ADA, 42 U.S.C § 12102, Section 504, 29 U.S.C. § 791(f), and HRA, NMSA § 28-1-2(o) and NMSA § 28-1-7(a), as both have mental and/or physical impairments that cause substantial limitations to major life activities.

9.      Plaintiffs also have a record of disability and have been regarded as having a disability.

10.     NMHU also knew Ms. Bradley to have a representative/advocating "relationship or association" under 42 U.S.C. § 12112(b)(4) and 29 U.S.C. § 705(22) with the many NMHU students and faculty for whom she sought ADA and Section 504 rights and protections, such as opposing their being excluded from the participation in, denied the benefits of, or subjected to discrimination the programs and activities of NMHU within the meaning of 29 U.S.C. § 794(a).

11.     Similarly, whether advocating disability rights/protections of NMHU *employees*

3

under NMSA § 28-1-7(a) or *students* under NMSA § 28-1-7(f) (access to public services, facilities, accommodations, or goods) or NMSA § 28-1-7(m) (participants in governmental services or programs), Ms. Bradley was also engaging in opposition/participation activity broadly protected by NMSA § 28-1-7.

12.     Plaintiffs are both qualified within the meaning of the ADA, Section 504, and HRA as Ms. Bradley meets the requirements for the position of Coordinator of Disability Services and can perform the essential functions of this position, having been employed by Defendants for approximately one year, and as Dr. Alvarez meets the requirements for the position of Associate Professor of Sociology and Criminal Justice in the Department of Sociology, Anthropology and Criminal Justice and can perform the essential functions of this position, having been employed by Defendants for approximately 8 years.

### *PLAINTIFF NATALIE BRADLEY*

13.     In January 2022—in the very process of hiring Ms. Bradley as "Coordinator of Disability Services" (a position structured almost entirely to discharge NMHU's ADA and Section 504 obligations, as detailed below)—NMHU immediately displayed its intent to discriminate based on disability.

14.     ADA prohibits making disability-related inquiries of a job candidate until after the employer has extended a formal offer of employment.  42 U.S.C. § 12112(d)(2); 29 C.F.R. §§ 1630.13(a), 1630.14(a),(b).

15.     But in January 2022, Defendants sent Ms. Bradley a disability-accommodations form to complete **before** Defendants had made Ms. Bradley a formal job offer.

16.     Ms. Bradley did not receive a job offer from Defendants until a week later, assigning an official start date of February 7, 2022.

17.     The United States Court of Appeals for the Tenth Circuit has held a defendant

engages in intentional disability-based discrimination if it is "deliberately indifferent" to ADA

and Section 504 requirements.  *See J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1298 & n.6

(10th Cir. 2016) (applying deliberate-indifference standard to a Title II damages claim); *Barber*

*v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (same as to a Section 504

damages claim).  A plaintiff need not show the defendant acted with "ill will or animosity toward

the disabled person." *Barber*, 562 F.3d at 1228.  Rather, a plaintiff can simply demonstrate: "(1)

[the defendant acted with] 'knowledge that a harm to a federally protected right is substantially

likely,' and (2) 'a failure to act upon that . . . likelihood.'" *Id*. at 1229 (quoting *Duvall v. County*

*of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

18.     NMHU's intent to discriminate based on disability was manifest in its pre-hiring

process and only became more evident in its actions after hiring Ms. Bradley.

19.     The position of Coordinator of Disability Services is an administrative position

without essential physical requirements.

20.     Ms. Bradley disclosed her disabilities to Defendants shortly after she was hired in

early 2022 and requested reasonable accommodations thereafter.

21.     Two of Ms. Bradley's reasonable accommodations requests were granted but one

was initially denied without explanation or invitation to engage in the interactive process. After

approximately one month of Ms. Bradley challenging Defendants' denial and refusal to engage,

Defendants finally re-engaged with Ms. Bradley and approved the third request.  But after

nominally approving the requests, Defendants then began a pattern of harassment and retaliation

against Ms. Bradley that eventually culminated in termination.

22.     The essential functions of Ms. Bradley's position are to ensure Defendants'

5

compliance with federal and state law regarding persons with disabilities; receive and process

student requests for reasonable accommodations; provide advocacy and guidance to students

with disabilities; and provide education regarding accessibility and disability services to students,

staff, and faculty.

23.     Thus, an atmosphere allowing Mr. Bradley to speak up without fear of reprisal on

ADA, Section 504, and HRA rights was essential both to her own job performance and to

NMHU's compliance with those laws.  And much of Ms. Bradley's work as Coordinator of

Disability Services included explicitly opposing, on behalf of students, practices on the part of

faculty, staff and administrators that may amount to "unlawful discriminatory practice" under

state law or "discrimination" under federal law.

24.     In discharge of her essential job functions, Ms. Bradley advocated on behalf of

individual students for reasonable accommodations. As an example, in Spring 2022, Ms. Bradley

advocated on behalf of students with blindness or other visual impairments who required course

materials translated to braille.

25.     For this advocacy, Ms. Bradley received immediate pushback from Defendants'

faculty, who did not want to assist in securing these accommodations and who interfered with

both the approval and implementation of these accommodations.  Senior faculty members and

administrative agents, Dr. Gadsden and Dr. Kathy Jenkins ("Dr. Jenkins"), became involved and

made a complaint to Ms. Bradley's supervisor, Dr. Ian Williamson ("Dr. Williamson") about

Ms. Bradley. In an attempt to resolve this issue and work collaboratively with faculty and staff,

Ms. Bradley met with Dr. Jenkins in Summer 2022 to discuss the issue and sent a follow-up

letter to both Dr. Gadsden and Dr. Jenkins, memorializing the discussions regarding

accommodations and asking them to encourage any concerned faculty members to contact her

6

for support and assistance.

26.     But NMHU continued resisting Ms. Bradley's efforts to bring NMHU into ADA,
Section 504, and HRA compliance.  During Spring 2022, while struggling to get Defendants to
respond to, approve, and provide her own accommodations, Ms. Bradley also struggled to get
them to provide reasonable accommodations to students with disabilities

27.     In these incidents, Ms. Bradley found that some instructors were receptive to
disability accommodations, while others were not, and that administrators would side with
instructors opposing the accommodations.  For example, Ms. Bradley attempted to aid a student
of Dr. Jacob Avery ("Dr. Avery") who needed to have course materials converted from Adobe
PDF format to Microsoft Word.  Dr. Avery refused.  An academic advisor/counselor suggested
the student transfer to Dr. Alvarez's class as an alternative, based on Dr. Alvarez's reputation of
supporting students.  And Dr. Gadsden promptly called Ms. Bradley to complain of Ms. Bradley
having made the request.

28.     Ms. Bradley also gradually discovered NMHU's records for her office had been
in disarray before she arrived.  Before Ms. Bradley began her employment with NMHU, Ricardo
Martinez ("Mr. Martinez"), Assistant Director of Admissions and Recruitment, had been filling
the role of Disability Services Coordinator in an interim capacity for approximately a year and a
half.  When Ms. Bradley began as Disability Services Coordinator, she found records on students
and their accommodation requests had not been well maintained, that some student requests for
accommodations had gone entirely unaddressed prior to her hire, and that students who had
requested reasonable accommodations had either not been approved or had been subjected to
significant delays, depriving them of equal opportunities in their education.

29.     In April of 2022, Ms. Bradley met with Jill Diamond.  At that time, Ms. Diamond

had just been hired as the new Human Resources ("HR") Director for NMHU. Although two of Ms. Bradley's own accommodation requests had finally been resolved (the service dog and telework), she requested the appointment with Ms. Diamond to discuss systemic issues with employee accommodations at NMHU due to the seeming lack of a procedure for employees to engage in an interactive process for reasonable accommodation requests, and the need for a disability service coordinator for employees to address these issues.  In this meeting, Ms. Bradley talked about her need for a service dog and disclosed to Ms. Diamond that she had disabilities.  She shared the issues she had encountered when trying to have NMHU acknowledge, approve, and implement her requests for reasonable accommodations.  Ms. Bradley knew she was not the only employee struggling with this issue because several employees had come to her in the few months she had been employed at that time, asking for assistance getting accommodations for themselves because HR had either referred them to her or had simply not responded to their requests.  Both of these alternatives had also happened to Ms. Bradley herself when seeking reasonable accommodations.  (Similarly, a graduate student at NMHU, who was also hired by NMHU to work as an instructor, would later write a a letter discussing issues she had in getting HR to approve her service animal as an employee for Defendants, and how the issue went unaddressed for over six weeks until Ruth Mariampolski ("Ms. Mariampolski"), NMHU Director of Compliance and Title IX Coordinator, intervened on her behalf.)

30.     Ms. Bradley in this time learned of other staff facing resistance and interference in connection with their disabilities or efforts to seek accommodations for themselves and others. For a time during Ms. Bradley's employment, NMHU had a website coordinator who, herself, had a disability and who left employment after trying to make changes to render the NMHU

website more accessible for persons with disability under ADA considerations.  The website

coordinator faced resistance from the administration for seeking these changes and appeared

either terminated or pushed out of employment. After this weebsite coordinator left, NMHU had

no one responsible for assessing and implementing the school website's ADA compliance.

31.     After the above events, Ms. Bradley observed Dr. Gadsden began opposing her

whenever possible.  For example, whenever Ms. Bradley wanted to implement a change to

improve student accessibility to services for their disabilities, Ms. Bradley would get approval

from Dr. Williamson, and then present about the change in faculty meetings. At these meetings,

Dr. Gadsden vigorously opposed changes proposed by Ms. Bradley—despite the fact

accessibility issues were within Ms. Bradley's job description and competence, and by no means

the expertise of Dr. Gadsden, who has a Ph.D. in Sociology.

32.     After her first semester working with Defendants, Ms. Bradley had a better

understanding and insight into NMHU's pressing issues surrounding disability accommodations.

Ms. Bradley took the initiative, in keeping with her job duties, to try to improve the culture

around disability at NMHU.  She sought to increase knowledge and understanding of disability

laws as well as familiarity with the services offered by her office to support students, faculty, and

staff to ensure students with disabilities had equal access to NMHU's programs and services.  To

do this, she reached out to Jeminie Shell, a disability specialist working in the New Mexico

Governor's Office at the time, to collaborate on a training presentation on disability services.

The week before the Fall 2022 semester began, Ms. Bradley, along with Ms. Shell, presented to

all faculty and staff employed by Defendants. The presentation provided information about her

office—Academic Challenges and Cultivating Excellence in Student Success (ACCESS)

Services—and how ACCESS worked to provide reasonable accommodations to students with

9

disabilities in accordance with federal law.  In her presentation, Ms. Bradley discussed federal disability laws, types of disabilities, and resources available within and outside NMHU for instructors in providing accommodations, among other topics.

33.     In Spring 2022, Ms. Bradley also advocated for a student with a serious medical condition needing accommodations and modifications in student meal plan policies.  This advocacy angered administrators such as Dr. Denise Montoya ("Dr. Montoya").  (According to NMHU's website, Dr. Montoya since November 2022 has been Associate Vice President for Finance, Administration, and Government Relations, but she was also Director of HR since 2015 and—as discussed below—continued to have or exercise authority over HR since assuming her Associate Vice President role.)  When Ms. Bradley advocated on the referenced student meal plan policies, Dr. Montoya and other administrators interfered with the approval of these accommodations.

34.     At the time of this incident, Ms. Mariampolski acknowledged to Ms. Bradley that meal plan policies were within Ms. Bradley's job description.  But Ms. Mariampolski warned Ms. Bradley that Dr. Montoya was "anti-disability."  Ms. Mariampolski also warned Ms. Bradley that although Dr. Montoya had been removed from HR (following a history of HR problems), she continued to supervise and direct the HR functions of Ms. Diamond, who nominally replaced Dr. Montoya in HR.

35.     Ms. Mariampolski's statement to Ms. Bradley—that Dr. Montoya had ongoing control of HR/disability descisions—was consistent with Dr. Alvarez's experience during this time.  On August 25, 2021, Dr. Alvarez requested an accommodation (mental health-related) to hold courses online, and the eventual approval for this accommodation came by email from Dr. Montoya, despite her signature line reading "Associate Vice President for Finance,

Administration, and Government Relations/Adjunct Faculty."

36. According to her public LinkedIn profile, Ms. Mariampolski received a law degree in 2009; was for a combined 10 years a private lawyer, then government lawyer and hearing officer in the area of employment law, including EEO and ADA; and since March 2020 has had the following duties on behalf of NMHU:

      a. ***Intake and investigation of complaints alleging discrimination***, including complaints ***under*** Title VII, ***the ADA***, and Title IX.

      b. For non-Title IX matters, ***conduct investigations and write determinations which inform the President of the University of investigation findings and recommend a resolution***.

      c. For Title IX matters, serve as Title IX Coordinator and Title IX Investigator.

      d. Policy development relating to Title IX procedures under the 2020 Title IX Final Rule.

      e. Creation and implementation of training programs related to Title IX and other ***antidiscrimination law, applicable to students, faculty, staff, and administration***.

      f. ***Provide*** research and ***expertise to Human Resources on employment law issues***.

*See* attached Exhibit A (Ruth Mariampolski LinkedIn Profile) (emphasis added).

37. Given Ms. Mariampolski's education, experience, "expertise," and NMHU duties and authority, her admission of Dr. Montoya's "anti-disability" bias and abiding control over HR is imputable to NMHU as specific proof of an institutional intent to engage in disability-based discrimination and to have "anti-disability" bias as a motivating factor in its adverse employment action. *See* Fed. R. Evid. 801(d)(2) (allowing use of statement against opposing part if: "(C) … made by a person whom the party authorized to make a statement on the subject; or (D) … made by the party's agent or employee on a matter within the scope of that relationship and while it existed").

38.     By general agency law, awareness of such facts by Ms. Mariampolski, within the course and scope of her job as Compliance Director, is imputed to the principal, NMHU.  Under New Mexico law, "Since a corporation can act only through its officers, agents and employees, it is necessarily chargeable with the composite knowledge of its officers and agents acting within the scope of their authority."  *Sawyer v. Mid-Continent Petroleum Corp.*, 236 F.2d 518, 520 (10th Cir. 1958) (applying New Mexico law) (citing 19 C.J.S., Corporations, § 1081, p. 618); *Trinity Universal Ins. Co. v. Rocky Mountain Wholesale Co.*, 353 F.2d 574, 577 (10th Cir. 1965) (applying New Mexico law); Restatement (Second), Agency, § 275.  Similarly, under NMHRA, a manager's knowledge of an illegal employment practice imputes to the corporation.  *See Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 34, 135 N.M. 539, 551-52.   In *Ocana*, the New Mexico Supreme Court held that in evaluating who is authorized to receive binding notice of an NMHRA illegal employment practice for a corporation, the question is whether the individual has managerial authority or was part of the corporation's management.  *Id*.

39.     Imputing Ms. Mariampolski's particular knowledge regarding Dr. Montoya's "anti-disability" bias to NMHU is especially appropriate, since Ms. Mariampolski's self-described duties include not only investigating discrimination, but also making determinations on such investigations, informing the NMHU President of her findings, and recommending corrective action or "resolution."  Ex. A.

40.     Imputing Ms. Mariampolski's direct knowledge and comments regarding Dr. Montoya (as well as the President's presumed knowledge) to NMHU is also apt with respect to issues of Defendants' HRA and punitive-damage liability, because the Tenth Circuit holds scienter of senior controlling officers of a corporation may be attributed to the corporation itself to establish liability when those senior officials were acting within the scope of their apparent

12

authority.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003) (citing

*Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001)

(holding that the scienter of an agent of a corporate defendant is attributable to the corporation as

a primary violator of § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934); *Cromer*

*Finance Ltd. v. Berger*, Nos. 00 Civ. 2284(DLC) & 00 Civ. 2498(DLC), 2002 WL 826847, at

*7-8 (S.D.N.Y. May 2, 2002) (holding that scienter of partner of accounting firm could be

imputed to the firm itself under traditional agency principles); *In re JDN Realty Corp. Sec. Litig.*,

182 F.Supp.2d 1230, 1246 (N.D.Ga. 2002) (holding that scienter of chief executive officer of

defendant corporation was attributable to the corporation); 2 Thomas Lee Hazen, Treatise on the

Law of Securities Regulation § 12.8[4], at 444 (4th ed. 2002) ("[K]nowledge of a corporate

officer or agent acting within the scope of authority is attributable to the corporation.")

41.     Further, by leaving Dr. Montoya with authority over NMHU HR even after its

"Director of Compliance" and others (including Ms. Bradley after this conversation and,

presumably, the NMHU President) knew of Dr. Montoya's "anti-disability" bias, NMHU:

> a.      knowingly "utilize[ed] standards, criteria, or methods of administration"
> that "have the effect of discrimination on the basis of disability" and "perpetuate the
> discrimination of others who are subject to common administrative control," 42 U.S.C. §
> 12112(b)(3);
>
> b.      willfully institutionalized "discriminat[ion] against a qualified individual
> on the basis of disability," *id*.;
>
> c.      signaled to both students and employees of NMHU that HR and the
> administration at large were no more than a catch-and-kill trap or dead-end alley for
> complaints of disability discrimination or retaliation;
>
> d.      again displayed "deliberate indifference" to the requirements of ADA,
> Section 504, and HRA, by:
>
> > i.      avowing "knowledge that a harm to a federally protected right is
> > substantially likely"; and

13

ii.      admitting its "failure to act upon that … likelihood,"

*Barber*, 562 F.3d at 1229 (quoting *Duvall*, 260 F.3d at 1139); and

e.      thus admitted its past and future intent to discriminate based on disability. *See J.V.*, 813 F.3d at 1298 & n.6; *Barber*, 562 F.3d at 1228.

42.      Further, Dr. Williamson also warned Ms. Bradley that Dr. Montoya was politically powerful and that Ms. Bradley could expect negative consequences.  And in demonstration and proof of this threat, after Ms. Bradley noted to Mr. Williamson that approving meal plans was in her job description, NMHU removed such duties from Ms. Bradley's job description, and Mr. Williamson informed Ms. Bradley that Dr. Montoya would be taking over such duties.

43.      By warning Ms. Bradley that Dr. Montoya posed a looming threat to her employment, while themselves offering no alternatives and taking no action to resist Dr. Montoya's bias infecting employment actions, both Ms. Mariampolski and Dr. Williamson were doing nothing but, themselves, threatening Ms. Bradley against advocating for ADA, Section 504, and ADA compliance.

44.      Still, beginning in late Summer and early Fall 2022, Ms. Bradley began advocating for an increase to her department's budget to meet the needs of all students with disabilities on campus. Ms. Bradley was ultimately able to secure a significant increase to her department's budget, which ensured the provision of translation and interpretation services, assistive technology, and other services and supports students with disabilities are entitled to.

45.      But again, during her push to increase her department's budget, Ms. Bradley was met with pushback and criticism from Defendants' administrators who were angered by her vocal opposition to their practices.

46.      In Fall 2022, Ms. Bradley collaborated with the Internet Technology Department

("IT") and Center for Teaching Excellence ("CTE") to develop training modules for instructors to facilitate rendering their course materials in accessible formats, such as an instructional module on how to obtain transcripts from videos so they can be available to students.  This service was needed for a student who is blind, so she could read the transcripts with her computer device that converts Microsoft Word documents into braille.  This student enrolled in an archeology course with Victoria Evans ("Ms. Evans") as the instructor.   Ms. Evans reached out to IT for assistance, reviewed the instructions, and received help from a contract worker hired to provide special assistance regarding technology for the blind.  Ms. Evans considered this a professional growth opportunity and considered it part of her duties to make sure her course materials are accessible.  But shortly after the class began, Ms. Evans reported to Ms. Bradley that Dr. Gadsden pressured Ms. Evans not to engage in these activities, claiming it was not her responsibility.  Ms. Evans pushed back, stating the changes did not require significant extra time, and she felt it, indeed, was her responsibility to make such simple changes.  Dr. Gadsden then expressed frustration with this 'setting a precedent' for other instructors to follow.  (And after Ms. Evans then retired, in Spring/Summer 2023, she told Ms. Bradley NMHU had delayed or denied typical provision of her retirement funds, forcing Ms. Evans to fight to receive them.)

47.    In addition, despite Ms. Bradley's prior efforts to work with Dr. Gadsden and Dr. Jenkins in Summer 2022 (inviting them to come to her again in the future for assistance and asking them to encourage instructors to do the same), in January 2023, Dr. Gadsden and Dr. Jenkins again made a complaint directly to Dr. Williamson regarding accommodation letters for the Spring 2023 semester—again without reaching out to Ms. Bradley or trying to resolve the issues they had directly with her beforehand.

48.    The pushback against Ms. Bradley's advocacy in these examples and in other

cases, ultimately led to threats and reprisals against her from Defendants and their faculty and administrators.

49.     On January 10-11, 2023, Ms. Bradley attended the NMHU President's Council for Diversity, Equity, and Inclusion ("PCDEI") retreat.  At this meeting, Ms. Bradley spoke out in support of Defendants' employees with disabilities and voiced her opposition to Defendants' practices regarding accessibility for employees.  Ms. Bradley voiced concerns about the seeming lack of policies and procedures for employees with disabilities requesting reasonable accommodations, leading to significant delays or simply no response to requests.  Ms. Bradley spoke about the need for an ADA coordinator for employees who could implement policies and procedures and ensure that Defendants were acting in accordance with the ADA. Upon returning to campus the following week for the beginning of the Spring 2023 semester, Ms. Bradley learned from the Ms. Mariampolski that NMHU's liaison to the Higher Learning Commission (HLC) (the accrediting institution for colleges and universities in the United States), Keith Tucker, was present at the PCDEI retreat and later approached Ms. Mariampolski to discuss some of the issues Ms. Bradley had raised.  Ms. Bradley then called Mr. Tucker to tell him she did not know he was the liaison to HLC or that he would be taking her statements back to Defendants' administration.  Ms. Bradley also expressed concern to Mr. Tucker that Defendants "might fire her" for speaking out about these issues.  Mr. Tucker confirmed that he had repeated Ms. Bradley's statements to NMHU administration.

50.     Shortly after this meeting, Defendants told Ms. Bradley she was required to request renewals for her own reasonable accommodations despite there being no issues with her work performance, or changes in her disabilities and serious medical condition at that time.

51.     During this time, Dr. Gadsden and Dr. Kathy Jenkins made another complaint

16

about Ms. Bradley to her supervisor, Dr. Williamson, and then continued to raise their complaints at a Faculty Senate meeting.

52.     Throughout January 2023, Ms. Bradley experienced growing hostility in the workplace, which finally did adversely impact her mental health.

53.     By the beginning of the Spring 2023 semester, Ms. Bradley felt increasingly intimidated by Dr. Gadsden. On multiple occasions in January of 2023, Ms. Bradley witnessed Dr. Gadsden standing and waiting in areas near Ms. Bradley's office, seemingly watching her arrive or leave. On these occasions, Dr. Gadsden did not greet Ms. Bradley or approach her to discuss anything.  Dr. Gadsden engaging in this behavior felt hostile to Ms. Bradley, and she told an ACCESS office coworker about it.  This colleague offered to walk Ms. Bradley to her office because of this, and when later doing so, the colleague witnessed Dr. Gadsden engaging in this behavior.

54.     At the beginning of the Spring 2023 semester, Dr. Williamson also told Ms. Bradley the university was making everyone renew telework contracts through HR.  He told Ms. Bradley she would have to submit a telework request to HR.  Ms. Bradley emailed HR asking how to proceed and what information HR needed.  Ms. Diamond responded, copying Roberta Vigil ("Ms. Vigil").  Ms. Diamond told Ms. Bradley the telework agreement on file for her was effective until March 7, 2023, and if she would be requesting to continue teleworking after March 7, 2023, she should fill out an accommodation request form and include substantiating medical documentation.  (Note, in light of her February 2022 start date, by March 7, 2023, Ms. Bradley would have easily satisfied the FMLA's months (12) and hours (1,250) of service requirements.)  When Ms. Diamond told Ms. Bradley this, Ms. Bradley replied stating concern about the number of people who might access her medical information.  But Ms. Diamond never

provided clarity on this point.  Ms. Bradley began preparing the telework contract, but still sought information about who the ADA coordinator for Defendants was because she wanted to be sure her information was being kept confidential.

55.     Ms. Bradley was concerned about Dr. Montoya having access to her confidential information, both because of Dr. Montoya's confrontation with Ms. Bradley in October of 2022 and because of the warnings Ms. Mariampolski and Dr. Williamson had given of Dr. Montoya's bias and inclination to retaliate.

56.     In mid-January 2023, Ms. Bradley's work environment had thus become broadly, pervasively hostile, with her direct supervisor (Dr. Williamson), NMHU's "Compliance" Director (Ms. Mariampolski), the known force behind HR (Dr. Montoya), and other powerful faculty (Dr. Gadsden and Dr. Jenkins)—all avowing, exhibiting, and implicitly condoning and ratifying institutionalized animus toward disabilities services.  Ms. Bradley's condition (her disabilities and serious medical condition) thus deteriorated.  Following the advice of her healthcare providers, Ms. Bradley requested temporary medically necessary leave. This request was made through the appropriate procedures, but Defendants denied this request.

57.     Because of the events addressed above, Ms. Bradley felt increasingly stressed, which triggered her asthma and worsened her mental health.  Ms. Bradley was experiencing an increase in difficulty breathing related to her asthma as well as anxiety and panic attacks.  In mid-January, Ms. Bradley began working on getting medical appointments scheduled to address the changes to her mental health.  She secured two appointments for January 27, 2023, to address her physical and mental health and asthma concerns. Ms. Bradley communicated her need to take sick leave to attend these medical appointments to Dr. Williamson first by email, and then also by following up with a phone call.

18

58.     About a week after these events, at the beginning of the Spring 2023 semester, on January 26th at 4:28 p.m., Ms. Diamond sent Ms. Bradley an email informing her that a meeting in HR was being scheduled for the following day, January 27th, at 1:30 pm.  Ms. Bradley responded to Ms. Diamond's email at 4:34 pm, asking the purpose of the meeting and informing Ms. Diamond that she already had a personal appointment scheduled from 1-2 pm on January 27th. Ms. Bradley asked Ms. Diamond to offer an alternative time for the meeting.  At 5:07 pm, Ms. Diamond replied that she would reschedule the meeting to 11 am for the following day and said she would share the purpose of the meeting upon Ms. Bradley's arrival.

59.     On the morning of January 27, 2023, at 9:00 am, Ms. Bradley informed Ms. Diamond she was on sick leave that day to attend her two medical appointments and asked for the meeting to be rescheduled for the following week. (These were the appointments she had scheduled to seek treatment for her mental health as the stress she had been experiencing at work was triggering for her mental illness as well as her asthma.) About an hour later at 9:57 am, Ms. Bradley had just left her first medical appointment for the day and sent Ms. Diamond an email with the subject line reading, "Please see attached letter and please advise about FMLA process. Thank you."  The letter Ms. Bradley had attached was from her healthcare provider, dated January 27, 2023. The letter informed NMHU that Ms. Bradley was seen that morning and should be excused from work to get "medical and psychological help ... to be able to function." At 3:41 pm that afternoon, Ms. Diamond sent Ms. Bradley an email stating the purpose of the meeting scheduled for that day was to hand deliver a termination letter to Ms. Bradley. Ms. Diamond attached the letter to the email and instructed Ms. Bradley to return all NMHU property and retrieve any personal effects she had on campus.  The attached termination letter read that NMHU was exercising its right to terminate Ms. Bradley's employment during her

19

probationary period.

60.    At the time she received notice of termination, Ms. Bradley had just seven

business days left in her 12-month probationary period.  Thus, in turn, she was also just seven

business days shy of satisfying the "12 month" service requirement for FMLA eligibility to take

leave.

61.    Defendants' termination notice simply justified Ms. Bradley's termination as an

exercise of their right to terminate any employee during the employee's probationary period; no

performance or other specific reason was provided.

62.    After being terminated, Ms. Bradley sought to recover her personal property from

her office (through a coworker) but found a blue bag of personal textbooks missing.   When she

inquired about them, NMHU gave no significant response and took no action.  When Ms.

Bradley contacted campus police, they also took no action.  Finally, Ms. Bradley contacted Ms.

Diamond, informed her the textbooks were worth over $500, and stated Ms. Bradley intended to

report the matter as a potential felony.  And only then did someone (whom Ms. Diamond

declined to identify) purportedly returned the books to HR for Ms. Bradley to retrieve.

63.    In turn, Ms. Bradley alleges Defendants willfully, maliciously, and recklessly:

a.    aided, abetted, compelled or coerced the commission of unlawful
discriminatory practice based on disability and serious medical condition and based on
Ms. Bradley's relationship/association with disabled persons for whom she advocated;

b.    engaged in threats and reprisals against her for her opposition of unlawful
discriminatory practice based on disability and serious medical condition (on behalf of
others and on behalf of herself);

c.    willfully obstructed and prevented her and others from complying with
provisions of the ADA, HRA, and other state and federal laws;

d.    retaliated against her by taking adverse employment actions against her;

e.      denied requests for reasonable accommodations (including leave requests) and refused to engage in the interactive process to address any concerns with those requests; and

f.      engaged in a pervasive pattern of harassment against her that fostered a hostile work environment.

64.     Ms. Bradley further asserts Defendants did the foregoing in willful, malicious, and reckless violation of FMLA, ADA, Section 504, HRA, and WPA.

65.     In turn, Ms. Bradley, on June 12, 2023 filed a Charge of Discrimination with New Mexico Human Rights Bureau ("NMHRB")  and Equal Employment Opportunity Commission ("EEOC"), obtaining an NMHRB Letter of Determination, purportedly issued/placed in the mail on February 20, 2024 (though Ms. Bradley did not, in fact, receive it until March 4, 2024), and an EEOC Notice of Rights to Sue issued on or about April 3, 2024, making Ms. Bradley's original ADA and NMHRA Complaint (entered on this Court's docket May 20, 2024) timely filed within 90 days thereafter.

66.     In all the above, Defendants engaged in a pattern of preying upon known disabilities of an employee (Ms. Bradley), undermining her job performance, reducing her authority within NMHU, and destabilizing her physical and/or mental condition to a point that would either drive her into medical leave, forced resignation, or fabricated grounds for termination.  And Defendants—especially Dr. Gadsden—repeated that pattern toward others, including Dr. Alvarez.

### *PLAINTIFF REBECCA ALVAREZ*

67.     Dr. Alvarez resides in Santa Fe, New Mexico.  Dr. Alvarez has been employed by NMHU since 2016 and is currently an Associate Professor of Sociology and Criminal Justice in the Department of Sociology, Anthropology and Criminal Justice.  The position of Associate

Professor of Sociology and Criminal Justice in the Department of Sociology, Anthropology and Criminal Justice is an instructor position without essential physical requirements.  Dr. Alvarez disclosed her disabilities to Defendants several times, including self-identifying as "on the spectrum" to Defendant Gadsden multiple times in 2018-2019; as neurodivergent (unspecified) to President Sam Minner in a Zoom meeting on October 13, 2023; as having a disability (non-specific) via PayCom (the online 3rd-party replacement for the Payroll Department) on October 31, 2023; and as neurodivergent with ADHD to Dr. Brandon Kempner in a meeting in his office in Douglas Hall on November 14, 2023.

68.     Despite these disclosures, rather than tolerating and accommodating Dr. Alvarez's status, Dr. Gadsden and NMHU harassed and discriminated against Dr. Alvarez and other NMHU staff who are either neurodivergent or have job duties to support such persons.  And over the same period, Dr. Alvarez observed that NMHU's striking turnover in HR (with departures of Jill Diamond, Mariama Whalen, and Kelly Barnes) and disability services (including, but not limited to, the termination or resignation of Ms. Bradley) suggests NMHU is shirking and, in fact, deliberately undermining its HR/disability functions.  (Further, as referenced, Ms. Bradley understood that the referenced HR staff had still been answering to Dr. Montoya, despite her known hostility to disabilities and disability services.)

69.     Dr. Alvarez observed that from 2016-2022, Dr. Gadsden (whom NMHU later promoted to full Professor) and another full Professor in her department, Dr. Orit Tamir, together harassed 'disabled' and disability-services-providing staff.  Dr. Alvarez was aware Ms. Bradley's job duties included facilitating/advocating for students who required disability accommodations.  Dr. Alvarez understood NMHU either fired or caused Ms. Bradley to resign toward the end of the 2022-2023 Academic Year ("AY").  Dr. Alvarez also observed Ms.

22

Bradley was one of four, revolving disability service coordinators in the past few years.

70.     Dr. Tamir also harassed another openly neurodivergent faculty member, Dr. Lewis Borck, who then left NMHU after only two years for another campus in Oklahoma, despite his family still living in Albuquerque.   And during the Spring semester of 2022 (in reference to the case of a blind student who was anticipated to enroll at that time, and who took Dr. Alvarez's Introduction to Sociology course in Fall 2022), Dr. Tamir told Dr. Alvarez, "Highlands isn't really equipped to handle ADA, anyway."

71.     Because of incidents such as these, at the beginning of AY 2022-2023 (August 26, 2022), Dr. Alvarez (along with most tenured/tenure-track members of her department) voted not to nominate Dr. Tamir (who had retired) to the status of emeritus professor.  In connection with the vote, Dr. Alvarez commented to Dr. Gadsden that her own mental health would be better without Dr. Tamir around.  Shortly thereafter, Dr. Gadsden seemed to mount a campaign of harassment and discrimination toward Dr. Alvarez, aimed at elevating her anxiety level, and causing her distress and deterioration of her mental health.

72.     Through the end of 2023, Dr. Gadsden's tactics ranged from ongoing aggressions to more direct interference with Dr. Alvarez's job, including, but not limited to instances such as:

    a.      Late Fall Semester of 2022: Leaving Dr. Alvarez off the list of search committee members for the department's Archaeology position until Dr. Mario Gonzales requested Dr. Alvarez's instatement several times, resulting in her late addition to the committee on or around February 9, 2023. This recurred in Fall of 2023. This affected Dr. Alvarez performance evaluation in terms of service, a record used in evaluating promotion.

    b.      Between Fall 2022 and Fall 2023: Dr. Gadsden took away most of Dr.

23

Alvarez's advised students, which directly impacts Dr. Alvarez's performance evaluations on teaching and advising, a record used in evaluating promotion.

  c.  Fall Semester of 2023: Giving Dr. Alvarez a very negative performance evaluation, despite very positive evaluations of her other colleagues. This could lead to post-tenure review on the part of NMHU.

  d.  Fall Semester of 2023: Terminating Dr. Alvarez without cause as a reviewer from a journal of which Dr. Gadsden was the editor, within 3 hours of sending the negative evaluation on September 29, 2023. This affects Dr. Alvarez's performance evaluation in terms of scholarship, a record used in evaluating promotion.

  e.  Fall Semester of 2023 and ongoing: Giving all the other faculty members in the hallway where Dr. Alvarez's office was located a key but not giving Dr. Alvarez a key, so Dr. Alvarez was forced to ask Dr. Gadsden for access.  For an ongoing period thereafter, Dr. Alvarez has not had access to the hallway where her office is located unless someone else had propped open the door.  On October 2, 2023, Dr. Alvarez requested a key from Dr. Gadsden.  At that time, Dr. Alvarez saw Dr. Gadsden watching from the window of a conference room as Dr. Alvarez was unable to open the door and asked to be let in.  Dr. Gadsden said she had a key, then immediately contradicted herself and said that she did not have one, letting Dr. Alvarez into the hallway via a nearby classroom.  On November 8, 2023, Dr. Alvarez discovered Dr. Kimberly Munro and Dr. Thomas Brooks had received their keys to the same hallway before or at the beginning of the Fall semester.  This affected and still affects Dr. Alvarez's job performance in all areas, as she still does not have a hallway key, and without access to Dr. Alvarez's office, she cannot do her job.

24

      f.      Late Fall Semester of 2023: Not giving Dr. Alvarez Fall Intersession work, which Dr. Alvarez had received in Fall of 2022.  This directly caused Dr. Alvarez a loss of $3,000 for a course contract.

      g.      Fall Semester of 2023 and ongoing:  NMHU's website ceased displaying Dr. Alvarez's area (the Public Affairs-Applied Sociology program) as an option when students applied online for graduate programs—a process that uses the application Slate, which Kyana Cruz oversaw at the time.  This began on or by October 23, 2023, when Dr. Alvarez received an email from a graduate student attempting to apply for the Public Affairs-Applied Sociology program, who had been steered into the Public Affairs-History and Political Science program instead by the Slate system.  Dr. Alvarez emailed Kyana Cruz about this on October 27, 2023.  And the problem was ongoing thereafter for months.

73.      Other key administration staff have known of Dr. Alvarez's neurodivergence for an extended period and have continued to allow, to refrain from correcting, to ratify, and to condone Dr. Gadsden's behavior since well after NMHU knew or should have known of her wrongful conduct and prejudices.  For example, as the stress of Dr. Gadsden's behavior mounted, Dr. Alvarez was medically diagnosed with ADHD Inattentive Type on November 28, 2023; at that time began receiving treatment for the diagnosis; and on December 18, 2023 had specific workplace accommodations recommended by another physician.

74.      On December 31, 2023, Dr. Alvarez (through legal counsel) sent NMHU a written request:

      a.      for physician-recommended accommodations to be granted pursuant to ADA 42 U.S.C. § 12112(b)(5)(A) and HRA § 28-1-7(j) and § 28-1-2(v);
      b.      for assurance that NMHU would protect Dr. Alvarez from any threat,

reprisal, retaliation, or discrimination for this request and record of ADHD under ADA 42 U.S.C. § 12203 or HRA § 28-1-7(i)(2); and

  c.  noting NMHU's striking HR turnover (with departures of Ms. Diamond, Mariam Whalen, and Kelly Barnes) shows the University has no functioning department empowered to act on these matters.

*Howell Letter to Dr. Gonzales-Walker*, dated 12/31/2023.

  75.  Dr. Alvarez sent this request to the Provost, Dr. Roxanne Gonzales-Walker, as well as to Dr. Peter Linder, Interim Dean, and Dr. Brandon Kempner, Past Dean.  But NMHU failed to take and unreasonably delayed action on Dr. Alvarez's concerns.

  76.  While Dr. Gonzales-Walker eventually replied to Dr. Alvarez's counsel's December 31, 2023 letter, that reply did not come until January 9, 2024 and only stated NMHU had "forwarded" Dr. Alvarez's requests to "HR" (with no individual specified).

  77.  On January 10, 2024, Dr. Alvarez's counsel replied to Dr. Gonzales-Walker:

  a.  noting NMHU had not identified a point of contact in HR for Dr. Alvarez to continue discussing her concerns;

  b.  reporting that since Dr. Alvarez's first letter, NMHU had failed to accommodate and harassed Dr. Alvarez. Dr. Gadsden had scheduled department meetings (where Dr. Alvarez was to produce a department report on the prior graduate council meeting) to occur just 30 minutes after said graduate council meeting. Dr. Gadsden had recently refused to record the meeting or provide Dr. Alvarez the recording. And this was striking, considering Dr. Alvarez had for some time been on record with NMHU (and Dr. Gadsden) as neurodivergent; Dr. Alvarez had requested this accommodation in the past; Dr. Gadsden had previously complied for a time; and Dr. Gadsden had only ceased after one such recording captured her making false claims to the Faculty Senate;

  c.   noting that this was also troubling, because of Dr. Gadsden having authority over Dr. Alvarez; Dr. Gadsden's history of aggression against Dr. Alvarez (as referenced above); other neurodivergent employees having been harassed and forced out (as referenced above); recent NMHU HR/disability-services attrition (as referenced above); concerns Dr. Gadsden has outsized actual or perceived authority over new HR staff lacking time or stature at NMHU; and circumstances suggesting Dr. Gadsden is influencing IT and admissions (as referenced above, with NMHU online systems having removed enrollment links to allow students to apply for the graduate program Dr. Alvarez coordinated:  Public Affairs-Applied Sociology); and

  d.  for the above reasons, again asking NMHU to assure me it would accommodate me, investigate the above concerns, and stop the harassment and

interference from Dr. Gadsden.

*Howell Letter to Gonzales-Walker*, dated 01/10/2024.

78.    On January 11, Dr. Gonzales-Walker replied to Dr. Alvarez's counsel:

      a.    naming Ms. Vigil as the HR representative assigned to Dr. Alvarez's accommodation request;
      b.    stating Ms. Vigil would process my accommodation request and contact Dr. Alvarez for any necessary information;
      c.    claiming "HR" was unaware of Dr. Alvarez's status or any need for accommodations; and
      d.    claiming NMHU had been "unable" to otherwise address Dr. Alvarez's letters and concerns before January 11th.

*Gonzales-Walker Letter to Howell*, dated 1/11/2024.

79.    The same day, Dr. Alvarez's counsel replied to Dr. Gonzales-Walker.  Regarding

NMHU's claim that HR had nothing "on file" for Dr. Alvarez, Mr. Howell:

      a.    reiterated that Dr. Alvarez had had concern with NMHU's HR and disability-services staffing, tolerance, and handling of neurodivergent employees;
      b.    noted (as referenced above) Dr. Alvarez had thus/still self-identified as "on the spectrum" to Dr. Gloria Gadsden multiple times in 2018-2019; as neurodivergent (unspecified) to President Sam Minner in a Zoom meeting on October 13, 2023; as having a disability (non-specific) via PayCom (the online 3rd-party replacement for the Payroll Department) on October 31, 2023; and as neurodivergent with ADHD to Dr. Brandon Kempner in a meeting in his office in Douglas Hall on November 14, 2023;
      c.    noted <u>EEOC's Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act</u> recognizes oral, unwritten reporting to any supervisor or manager puts the employer on notice of a disability and, itself, should prompt the employer to initiate an interactive process;
      d.    noted ADA-trained supervisors should have made HR aware of such notices and—in any event—refrained from discrimination or retaliation around such neurodivergence; and
      e.    based on the above, reiterated that Dr. Alvarez had "for some time been on record with NMHU as neurodivergent."

*Howell Letter to Gonzales-Walker*, dated 01/11/2024.

80.    For the next two weeks, NMHU:

      a.    made no response to Dr. Alvarez's counsel;
      b.    did not answer whether it would grant Dr. Alvarez's physician-

recommended accommodations;

       c.      made no contact with Dr. Alvarez to investigate or obtain details on her allegations of harassment;

       d.      continued withholding assurances of protection from retaliation or interference;

       e.      in fact, continued not accommodating Dr. Alvarez; and

       f.      in fact, continued to subject Dr. Alvarez to Dr. Gadsden's harassment.

     81.     In turn, on January 25, 2024, Dr. Alvarez's counsel wrote to Dr. Gonzales-

Walker, stating:

> To date neither Human Resources nor the administration has answered whether NMHU will provide Dr. Alvarez's requested accommodations.  Nor has there been a reply or inquiry one could fairly call "interactive process" under the ADA or HRA.

> It is nearly a month since Dr. Alvarez made the requests to you in writing on December 31, 2023.  It is also months since Dr. Alvarez made such oral requests to Dr. Gadsden.

> An employer should reply promptly to a request for reasonable accommodation. *See* EEOC's Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act.  If the employer needs to engage in an interactive process, this too should proceed as quickly as possible. *Id.*; *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 677, 7 AD Cas. (BNA) 1872, 1880 (7th Cir. 1998).  And the employer should act promptly to provide the accommodation.  *Id.*  Unnecessary delays can result in a violation of the ADA.  *Id.* ("In determining whether there has been an unnecessary delay in responding to a request for reasonable accommodation, relevant factors would include: (1) the reason(s) for the delay, (2) the length of the delay, (3) how much the individual with a disability and the employer each contributed to the delay, (4) what the employer was doing during the delay, and (5) whether the required accommodation was simple or complex to provide").

> Here, the delay is inexplicable.  The requested accommodations are simple and cost-free.  And as previously noted, as recently as the Fall semester, Dr. Gadsden was making and giving Dr. Alvarez access to recordings of the referenced meetings.

> Meanwhile, Dr. Gadsden is harassing Dr. Alvarez in the same, continuing manner.  A Faculty Senate meeting took place on January 24, after which Dr. Alvarez was not provided a recording, despite Dr. Gadsden requiring her to provide a report back to her department on Faculty Senate matters.  Further, a meeting for the Graduate Council on which Dr. Alvarez sits was scheduled within

thirty minutes of her department's meeting on January 26.  And Dr. Gadsden, who is both Department Chair and Chair of Graduate Council, has not advised whether Dr. Alvarez will receive a recording of this meeting.

Without immediate response and compliance by NMHU, we will deem further dialogue futile.  *See Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999) (citing *International Bhd. Of Teamsters v. United States*, 431 U.S. 324, 366 (1977)). Please meet your legal obligations immediately, or we will have no choice but to proceed with Charges at the Equal Employment Opportunity Commission and New Mexico Human Rights Bureau.

*Howell Letter to Gonzales-Walker*, dated 01/25/2024.

82.     In response to this letter, NMHU finally had an outside attorney, Patricia Ives

("Ms. Ives"), reply on January 25, 2024 as follows:

I represent NMHU and am working with your request on behalf of Associate Professor Alvarez. I intend to respond to that request this afternoon or tomorrow. Please communicate directly with me not with Dr. Gonzales Walker, Dr. Kempner, Dr. Linder or Ms. Vigil.

*Ives Email to Howell*, dated 01/25/2024.

83.     But despite this commitment, Ms. Ives' next communication (January 26, 2024):

a.     still did not answer whether NMHU would grant Dr. Alvarez the physician-recommended accommodations;

b.     only stated NMHU was "looking into the reasonableness" of the accommodations; and

c.     with respect to Dr. Alvarez's allegations of harassment, only stated "NMHU will initiate an investigation into these allegations and will be in touch with Dr. Alvarez concerning the investigation."

*Ives Email to Howell*, dated 01/26/2024.

84.     And despite even those claims, for the next two weeks, no one from NMHU ever

got "in touch" with Dr. Alvarez concerning the supposed investigation.

85.     And meanwhile, Defendants expanded efforts to undermine Dr. Alvarez.

86.     On January 25, 2024, Dr. Alvarez received the following email from a graduate

student in Dr. Gadsden's program, which read in part:

I would like to be added to your sociology course 5160, Organized Crime. I had emailed my coordinator to see if your other course, CJUS 4130, would be acceptable to add on Tuesday. However, since I never heard back, I missed the deadline to add a course.

87.     On January 27, 2024, Dr. Alvarez held a meeting with a student at the student's request who had previously as an undergraduate told Dr. Alvarez she was interested in applying to the Public Affairs-Applied Sociology program.  When Dr. Alvarez asked the student "What happened with Applied Sociology?," the student responded, "I was going to apply to Public Affairs, but then Dr. Gadsden talked me into going into Psychology instead."  (Psychology is not part of the department of Sociology, Anthropology, and Criminal Justice, but Public Affairs-Applied Sociology is.)  The student, a graduate student, claimed she had also been talked by Dr. Gadsden into applying to her online Criminology program for a second Master's degree.  This directly impacts enrollments in the Public Affairs-Applied Sociology MA program, which in turn impacts Dr. Alvarez's performance evaluations on teaching and advising, a record used in evaluating promotion.

88.     Later, Ms. Ives finally wrote to Dr. Alvarez's counsel, claiming "NMHU will provide Dr. Alvarez the requested accommodations."  *Ives Email to Howell*, dated 01/29/2024.

89.     Dr. Alvarez's counsel replied with thanks, while also repeating Dr. Alvarez's requests for:

> a.     the assurance requested on December 31st that Dr. Alvarez will be protected from any threat, reprisal, retaliation, or discrimination for her accommodation requests and record of ADHD;
> b.     the status of investigation and any corrective action on matters we raised in our January 10th correspondence; and
> c.     the assurance we requested on January 10th that NMHU will stop the harassment and interference from Dr. Gadsden.

*Howell Email to Ives*, dated 01/30/2024.

90.     But thereafter, NMHU continued only delayed, sporadic communication (such as

Ms. Ives' February 5, 2024 email, claiming "we are in the process of retaining an investigator"), while not giving or following through on assurance of an actual investigation and protection from discrimination and retaliation.

91.     Through mid-February 2024—30+ days after Dr. Alvarez's January 10, 2024 report of harassment and discrimination to NMHU Provost Gonzalez-Walker—NMHU had still not named the HR representative or "investigator" assigned to Dr. Alvarez's allegations.  And no HR representative or investigator had contacted Dr. Alvarez for an interview or information.

92.     In turn, on February 11, 2024, Dr. Alvarez electronically filed a Charge of Discrimination with NMHRB and EEOC, substantially recounting the above matters.  And simultaneously, Dr. Alvarez provided Defendants' attorney, Ms. Ives, a copy of the same.

93.     Yet the above harassment continued and in fact increased after Defendants' receipt of Dr. Alvarez's NMHRB/EEOC Charge.

94.     Defendants continued (and continue) to schedule Department meetings within 30 minutes of the Graduate Council meetings.

95.     Defendants have still not provided Dr. Alvarez with recordings that are being made of the Graduate Council meetings.

96.     Defendants still are not recording Faculty Senate meetings.

97.     Because of ongoing obstruction and non-cooperation from Dr. Gadsden, Dr. Alvarez has resigned her position as Program Coordinator for the Public Affairs-Applied Sociology MA program.

98.     As a result of all such forms of discrimination and retaliation thus continuing and escalating since she had filed her Charge of Discrimination, Dr. Alvarez obtained an Order of Non-Determination from NMHRB and a Notice of Rights to Sue from EEOC.  Dr. Alvarez has

filed her original Complaint and First Amended Complaint within the statutory period after receiving such Order and Notice, making Dr. Alvarez's Complaint in this matter timely under ADA and NMHRA.

## AS TO BOTH PLAINTIFFS

99.     Under ADA, Sec. 504, HRA, and WPA, Defendants discriminated against Plaintiffs "on the basis of disability" as defined by 42 U.S.C. § 12112;  engaged in unlawful discriminatory practice "because of disability or serious medical condition" as defined by § 28-1-7(a) NMSA 1978; and retaliated against, interfered with, coerced, or intimidated Plaintiffs because:

> a.     Under ADA, Plaintiffs by the same actions "aided or encouraged" other individuals in the exercise or enjoyment of ADA rights pursuant to 42 U.S.C. § 12203(b);

> b.     Under ADA, Plaintiffs by the same actions "opposed" employment practices made unlawful by ADA,[1] and "charged, testified, assisted, or participated" in ADA-related investigations, proceedings, or hearings pursuant to 42 U.S.C. § 12203(a);

> c.     under HRA, Plaintiffs by the same actions and by their protests against the other, above treatment "opposed any unlawful practice … testified or participated in" a proceeding under HRA, for which they were entitled to protection against "any form of threats, reprisal or discrimination" pursuant to NMSA § 28-1-7(I)(2); and

> d.     under WPA, Plaintiffs suffered retaliation as a direct result of engaging in protected activity, making good-faith protests, lawfully defending themselves, and

---

[1]     Such oppositional activities "include the many ways in which an individual may communicate explicitly or implicitly opposition to perceived employment discrimination." EEOC Enforcement Guidance on Retaliation and Related Issues. No. 915.004 (August 25, 2016) at 4.  https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm

invoking clear, legal rights, against Defendants' acts of discrimination and retaliation.

<u>ADDITIONAL JURISDICTIONAL FACTS</u>

100.    NMHU is a state educational institution and agency, created by Constitution and statute. *See* N.M. Const., art. XII, § 11, as repealed and reenacted on November 8, 1960 (changing the name of New Mexico Normal University to New Mexico Highlands University); 21-3-2 NMSA 1978.

101.    NMHU is Plaintiffs' "employer" as defined by HRA, NMSA § 28-1-2(B) and (A), as well as a "public employer" as defined by WPA, NMSA § 10-16C-2(C).

102.    Dr. Gadsden is an administrative head of NMHU and a "person acting for [Plaintiff's] employer" as defined by HRA, NMSA § 28-1-2(B) and (A), as well as an "officer" of a "public employer" as defined by WPA, NMSA § 10-16C-2(C).  As such, Defendant Gadsden is amenable to suit and joinder as a defendant to each cause of action.

103.    Defendant NMHU at all relevant times was an agency and arm of the State of New Mexico and can be sued pursuant to § 10-16C-4 NMSA 1978.

104.    The unlawful employment and whistleblower retaliation against Plaintiffs alleged herein were committed by Defendants on dates from 2022 through May 20, 2024 in the State of New Mexico, thereby making this action timely, and conferring jurisdiction over the parties and subject matter hereto in this Court.

105.    The statutory claims asserted herein under HRA and WPA are not subject to the New Mexico Tort Claims Act ("NMTCA"), which was enacted in 1976.

106.    Amended several times since 1976, by a legislature fully aware of the existence of NMTCA, HRA is an express legislative waiver of the partial immunity otherwise created by the NMTCA.

107.    HRA defines its covered employers to include "any person employing four or more persons and any person acting for an employer" and defines "person" to include "the state and all of its political subdivisions."  *See* §28-1-2 (A) and (B) NMSA 1978.

108.    In addition, while setting forth the process by which an aggrieved person may appeal any administrative determination to the district court, HRA dictates "the state shall be liable the same as a private person."  *See* §28-1-13 (D) NMSA 1978.

109.    Finally, enacted in 2010, by a legislature fully aware of the existence of NMTCA, WPA is an express legislative waiver of the partial immunity otherwise created by the NMTCA.

110.    WPA not only defines its covered employers to include public employers; the entire statute is expressly limited to public employers.  *See* § 10-16C-2 (C) NMSA 1978.  That is, the entire purpose and effect of WPA is to create specific liability of public employers in waiver of prior NMTCA immunity.

111.    Pursuant to the New Mexico Supreme Court decision in *Luboyeski v. Hill*, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994), NMTCA does not supersede or override WPA.

112.    Nevertheless, pursuant to § 4-46-1 (A) NMSA 1978, Defendants had both "actual notice" and "written notice" of the occurrence giving rise to this Complaint within less than 90 days of said occurrences.

113.    Plaintiffs have satisfied all preconditions that would otherwise apply to sue under the NTCA, § 4-46-1 (A) NMSA 1978.

114.    In compliance with HRA and ADA, Plaintiffs have also initiated with NMHRB and EEOC timely Charges of Discrimination, pursuant to NMSA § 28-1-10(A); and prior to the expiration of 90 days from the date of service of EEOC's and HRB's orders/notice of rights to sue, filed this Complaint/Notice of Appeal in the federal district court where the discriminatory

practices occurred and where Defendants do business, pursuant to NMSA § 28-1-13(A).

115.    Pursuant to the WPA, NMSA §10-16C-6, Plaintiffs timely filed this Complaint

prior to the expiration of two years from the date on which the retaliatory actions occurred.

116.    Because the operative facts of Plaintiff's FMLA, ADA, and Section 504 claims so

closely relate to those of their HRA and WPA claims, the court has jurisdiction over the parties

and subject matter pursuant to 28 U.S.C. § 1367, HRA, NMSA § 28-1-13(A), and WPA, §10-

16C-4 NMSA 1978.

<u>CAUSES OF ACTION</u>

<u>COUNT I</u>
<u>FMLA DISCRIMINATION & RETALIATION/</u>
<u>INTERFERENCE WITH EXERCISE OF RIGHTS</u>
(<u>*against all Defendants*</u>)

117.    Plaintiffs repeat and reallege the preceding allegations as though again herein

fully set forth.

118.    All Defendants are an "employer" within the meaning of 29 U.S.C § 2611(4).

119.    All Defendants were, or acted directly or indirectly in the interest of, Ms.

Bradley's "employer" within the meaning of 29 U.S.C § 2611(4)(a).

120.    NMHU was engaged in commerce or in any industry or activity affecting

commerce within the meaning of 29 U.S.C § 2611(4)(a).

121.    NMHU employed 50 or more employees for each working day during 20 or more

calendar workweeks in 2022 or 2023 within the meaning of 29 U.S.C § 2611(4)(a).

122.    Ms. Bradley was and is otherwise qualified to perform the essential functions of

her position.

123.    At the time Defendants terminated Ms. Bradley had a "serious health condition"

under 29 U.S.C § 2611(11).

124.    On January 27, 2023, Ms. Bradley was an "eligible employee" within the meaning of 29 U.S.C § 2611(2).

125.    As of January 27, 2023, Ms. Bradley was just days shy of being employed at least 12 months by Defendants within the meaning of 29 U.S.C § 2611(2).

126.    As of January 27, 2023, Ms. Bradley had at least 1, 250 hours of service for Defendants during the previous 12-month period within the meaning of 29 U.S.C § 2611(2).

127.    As of January 27, 2023, Ms. Bradley was just days from being entitled to, and had not exhausted, 12 workweeks of leave pursuant to 29 U.S.C § 2612(a)(1).

128.    As of January 27, 2023, Ms. Bradley had given advance notice to her employer that she was seeking FMLA paperwork to request future, additional days of leave pursuant to 29 U.S.C § 2612(a)(1).

129.    Because the FMLA requires an employee to provide his employer "not less than 30 days' notice" before taking leave for foreseeable medical treatment, 29 U.S.C. § 2612(e)(2), giving such notice reasonably must be and is "protected activity" for purposes of an FMLA retaliation claim. *See Wehrley v. Amer. Fam Mut. Ins. Co.*, No. 12-1079 (10th Cir. January 3, 2013) (citing *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1276 n.8 (11th Cir. 2012); *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001) ("The right to take . . . leave pursuant to the FMLA includes the right to declare an intention to take such leave in the future.")).

130.    Defendants willfully interfered with, restrained, and denied Ms. Bradley's exercise of and attempt to exercise FMLA rights within the meaning of 29 U.S.C § 2615.  Ms.

36

Bradley suffered tangible, adverse employment actions, including but not limited to that

Defendants terminated the employment of Ms. Bradley on January 27, 2023.

131.    On such bases, Defendants committed:

a.       willful interference with Ms. Bradley's exercise of FMLA rights in

violation of 29 U.S.C § 2615(a)(1); and

b.      willful discrimination against Ms. Bradley in violation of 29 U.S.C §

2615(a)(2).

132.    Under 29 U.S.C § 2617, Defendants are liable to Ms. Bradley:

a.      for damages equal to—

i.      the amount of any wages, salary, employment benefits, or other
compensation denied or lost to Ms. Bradley by reason of the violation

ii.     the interest on the amount described in clause (i) calculated at the
prevailing rate;

iii.    an additional amount as liquidated damages equal to the sum of the
amount described in clause (i) and the interest described in clause (ii);

b.      for such equitable relief as may be appropriate, including employment,
reinstatement, and promotion; and

c.      reasonable attorney fees, and litigation costs including but not limited to
expert fees.

133.    Pursuant to 29 U.S.C § 2617(c), this action has been brought less than 2 years

after January 27, 2023—the date on which NMHU terminated Ms. Bradley.

### COUNT II –DISABILITY/SERIOUS HEALTH/MEDICAL CONDITION DISCRIMINATION AND RETALIATION
*(against Defendants NMHU and Regents with respect to ADA and Section 504, and against all Defendants with respect to HRA)*

134.    Plaintiffs repeat and reallege the preceding allegations as though again herein

fully set forth.

135.     In violation of the ADA, 42 U.S.C. § 12203(a) and (b), Section 504, and HRA, §

28-1-7 (a), (i)(1), and (i)(2) NMSA, Defendants engaged in an unlawful discriminatory practice

in matters of compensation, terms, conditions, and privileges of employment (including pay,

prestige, and treatment, a hostile work environment, demotion, and actual or constructive

termination of employment) against persons otherwise qualified because of disability and serious

medical condition; coerced, intimidated, threatened, or interfered with Plaintiffs in the exercise

or enjoyment of, or on account of their having exercised or enjoyed, or on account of their

having aided or encouraged any other individual in the exercise or enjoyment of ADA and

NMHRA rights; and engaged in, aided, abetted, incited, compelled and/or coerced forms of

threats, reprisal, retaliation against Plaintiffs for having "participated" in ADA and NMHRA

complaints or proceedings and "opposed [an] unlawful discriminatory practice" with respect to

the same conduct by Defendants.

136.     Section 504 prohibits interference with the exercise of rights granted by the law to

individuals with disabilities.  Section 504 incorporates anti-retaliation provisions of Title VI of

the Civil Rights Act of 1964, which "prohibits recipients from intimidating, threatening,

coercing, or discriminating against any individual for the purpose of interfering with any right or

privilege . . . or because he has made a complaint, testified, assisted, or participated in any

manner in an investigation, proceeding or hearing under this part." 34 C.F.R. §104.61 and 34

C.F.R. §100.7(e).  ADA provides, "no person shall discriminate against any individual because

such individual has opposed any act or practice made unlawful by" the ADA. 42 U.S.C. §

12203(a).  Because ADA and Section 504 anti-retaliation clauses are virtually identical, they are

generally analyzed together.  Non-disabled individuals who have "opposed any act or practice

made unlawful" by Title II of the ADA have standing to sue under the anti-retaliation provisions

of the ADA.  Thus, teachers and parents who advocate for disabled students have standing to

raise retaliation claims.  And in turn, NMHU knew Ms. Bradley's representative advocacy for

disabled students and staff was protected "opposition" under ADA and Section 504.

137.   Similarly, Ms. Bradley's representative advocacy for disability rights/protections

of NMHU employees under NMSA § 28-1-7(a) or students under NMSA § 28-1-7(f) or (m) was

opposition/participation activity broadly protected by NMSA § 28-1-7.

138.   The supposed non-discriminatory reason Defendants have offered for terminating

Ms. Bradley and for mistreating Dr. Alvarez are a mere pretext for discrimination, as evidenced

by facts that:

a.   Defendants never viewed, identified, or escalated any purported concerns

with Plaintiffs as matters warranting discipline until after Plaintiffs disclosed their

disabilities and began advocating for disability rights and complaining of mistreatment,

*see Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1174 (10th Cir. 2006) (explaining

that "evidence of pretext may include [evidence of an employer's] prior treatment of

plaintiff");

b.   Defendants' purported justifications for discipline and mistreatment rely

upon false accusations and false descriptions of conduct, *see Kendrick v. Penske Transp.*

*Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (a plaintiff my prove pretext by

producing evidence that "the defendant's stated reason for the adverse employment

action was false,"); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)

(from the falsity of Defendants' explanation, the Court "can reasonably infer . . . that

[Defendants are] dissembling to cover up a [retaliatory] purpose");

c.   even if it there were any accuracy in the allegations, the conduct alleged

against Plaintiffs did not amount to a violation of the severity Defendants claim, let alone grounds for mistreatment or termination, *see Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("The relevant "falsity" inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination");

    d.    Defendants have knowingly omitted context of events to cast Plaintiffs in a false, negative light, *see Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (finding fundamental unfairness and inadequacy of employer's investigation—including the decision makers deliberately preventing plaintiff from defending his actions and reaching their conclusions based on one-sided information—permitted jury to infer pretext and precluded summary judgment);

    e.    Defendants gave inconsistent, changing explanations for what the adverse actions against Plaintiffs would be and for why those actions were justified, *see Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) ("An employee may show pretext based on `weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief.");

    f.    Defendants have not articulated a fixed, objective standard under which they found Plaintiffs deserved mistreatment, discipline, or termination, more than other employees, see *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001) ("A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the

defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion.") (quoting *Chapman v. Al Transport*, 229 F.3d 1012, 1033-34 (11th Cir. 2000)) (emphasis added);

   g.     however Defendants may phrase the standard of conduct, under that standard, they treated other employees more favorably than Plaintiffs, *see Sonntag v. Shaw*, 22 P.3d 1188, 1203 (N.M. 2001) (acknowledging that a "jury can properly infer the ultimate fact of intentional discrimination from disparate treatment");

   h.     the apparent reasons Defendants treated other employees more favorably are that they are persons who have not declared any disability or advocated for Defendants to comply with disability laws including NMHRA, ADA, and Section 504, *see Kendrick*, 220 F.3d at 1230 (explaining that, to prove pretext through evidence of deviation of an unwritten company policy or practice, a plaintiff often provides evidence that she was treated differently from other similarly-situated employees who violated work rules of comparable seriousness);

   j.     Defendants violated their own HR policies, because Defendants:

       i.     did not investigate Plaintiffs' complaints at all;

       ii.     did not receive, document, process, investigate, or resolve Plaintiffs' complaints through neutral, unbiased, disinterested persons—even after Plaintiffs, through counsel, made such reports in writing;

       iii.     retaliated against Plaintiffs for invoking the complaint process; and

       iv.     attempted to intimidate Plaintiffs from further complaints;

*see Kendrick*, 220 F.3d at 1230 (explaining that a plaintiff can demonstrate pretext by presenting (1) evidence that the defendant acted contrary to a written company policy

prescribing the action to be taken by the defendant under the circumstances or (2) evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff); *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1003 (10th Cir. 2011) ("deviation" evidence can "permit[] a reasonable inference that [the employer] acted with an ulterior motive and . . . engineered and manufactured the reasons [it] proffered for terminating [the employee's] employment.'") (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1138 n.11 (10th Cir. 2003));

      k.     while doing so, and in stark contrast, Defendants engineered, exaggerated, solicited complaints and statements to manufacture and magnify, categorically credited, withheld notice from Plaintiffs of, and proceeded to take corrective action based upon (before giving Plaintiffs any opportunity to address) any possible insinuation of misconduct by Plaintiffs, *see Kendrick*, *supra*; *Twigg*, *supra*;

      l.     regardless whether it conformed to their own policies, Defendants' conduct did not comply with generally accepted HR practices, *see Maller v. Community College of Beaver County*, 43 F.Supp.3d 495, 513 (W.D. Penn. 2014) (finding genuine issue of material fact as to pretext based on expert testimony that employer did not conduct its purported restructuring plan in accordance with "standard HR standards"); *Ferretti v. Pfizer, Inc.*, No. 11-CV-04486 (N.D. Cal. January 10, 2013); available at https://scholar.google.com/scholar_case?case=17748243018221683134&q=ferretti+v+pfizer+inc&hl=en&as_sdt=6,32 (allowing expert testimony and finding genuine issue of material fact as to pretext on whether employer complied with "generally accepted HR practices"); and *Hernandez v. City of Vancouver*, No. CO4-5539FDB, 2009 WL 279038

(W.D. Wash. Feb. 5, 2009) (allowing expert testimony "as to proper governance standards" and "the City's deviation from good HR practices" because it was relevant and "could assist the jury because the average juror is unlikely to be familiar with HR management policies and practices."); *Smothers*, *supra* (finding fundamental unfairness and inadequacy of employer's investigation—including the decision makers deliberately preventing plaintiff from defending his actions and reaching their conclusions based on one-sided information—permitted jury to infer pretext and precluded summary judgment); and

   m. even if ultimate decisionmakers were neutral toward Plaintiffs on basis of disability/disability-advocacy (which Plaintiffs deny), their adverse, discipline, and termination decisions rested on persons exhibiting hostility toward Plaintiffs on that basis, thus permitting—under the "Cat's Paw" doctrine—a jury to infer Defendants' termination was tainted by the discriminatory/retaliatory animus of Dr. Montoya, Dr. Gadsden, and their direct subordinates, on whose reports Defendants relied, and thus also permitting a finding that the proffered reason for acting against and/or firing Plaintiffs is pretextual.  *See E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006) (""In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.")

139. Under ADA, 29 U.S.C. §§ 12117, 12203, and 12205, Section 504, 29 U.S.C. § 794a, and HRA, NMSA § 28-1-13, Defendants are liable to Plaintiffs for their resulting compensatory damages, including but not limited to back pay, front pay, employee benefits, and

emotional distress, liquidated and punitive damages for the willfulness, malice, and recklessness

Defendants displayed in the above acts, and for reasonable attorney fees, and litigation costs

including but not limited to expert fees.

COUNT III – WPA RETALIATION
*(against Defendants NMHU and Regents)*

140.    Plaintiffs repeat and reallege the preceding allegations as though again herein

fully set forth.

141.    Plaintiffs by the above complaints and opposition to Defendants' ADA, Section

504, and HRA violations:

> A.    communicate[d] to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act;

> B.    provide[d] information to, or testifie[d] before, a public body as part of an investigation, hearing or inquiry into an unlawful or improper act; **and**

> C.    object[ed] to or refuse[d] to participate in an activity, policy or practice that constitutes an unlawful or improper act.

*See* §10-16C-2 (C)(3) NMSA 1978.

142.    The disability-related conduct of Defendants upon which Plaintiffs advocated,

reported, and complained constituted reasonably-perceived "unlawful or improper acts" within

the meaning of WPA, because they involved "a practice, procedure, action or failure to act on

the part of a public employer" that:

> (1)    violates a federal law, a federal regulation, a state law, a state administrative rule or a law of any political subdivision of the state;

> (2)    constitutes malfeasance in public office; or

> (3)    constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public.

44

*See* §10-16C-2 (E) NMSA 1978.

143.   Defendants took retaliatory actions against Plaintiffs for these reports in the form of a hostile work environment, demotions, actual and/or constructive termination of Plaintiffs' employment.  *Lerma v. N.M. Dep't of Corrections*, 2024-NMCA-011, *cert. granted* ("Our Legislature has defined 'retaliatory action' broadly as 'any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment'") (citing § 10-16C-2(D) NMSA); *Dart v. Westall*, 2018-NMCA-061, ¶ 23, 428 P.3d 292 (concluding the evidence sufficed to support a jury finding of "retaliatory action" under the NMWPA where the defendant reassigned the plaintiff to a new division, "created a hostile work environment, made humiliating comments about him to his colleagues, issued him a substandard work vehicle, and required him to surrender his key to the forensic lab and cease investigating his caseload of crimes against children").

144.   On such bases, Defendants committed whistleblower retaliation in violation of NMSA § 10-16C-3.

145.   Under NMSA § 10-16C-4, Defendants are liable to Plaintiffs for actual damages, including but not limited to back pay, front pay, lost employee benefits including but not limited to retirement benefits under the Public Employees Retirement Association, and emotional distress, reinstatement to the position and seniority status Plaintiffs would have had but for the violation, two times the amount of back pay with interest on the back pay, compensation for special damages including emotional distress sustained as a result of the violation, and litigation costs and reasonable attorney fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court order as to their claims for violations of

FMLA, ADA, Section 504, HRA, and WPA, that Plaintiffs be awarded damages, including but not limited to unpaid or underpaid wages; back and front pay and benefits; pre- and post-judgment interest as permitted by law; emotional distress; additional liquidated damages in the amount of the same foregoing; punitive damages; costs and reasonable attorneys' fees; damages under NMSA §10-16C-4(A) including actual damages including back pay, reinstatement, two times the amount of back pay, interest on the back pay, special damages including emotional distress and associated medical bills; and the same and further common-law damages pursuant to NMSA §10-16C-4(C); costs and attorney fees pursuant to NMSA §10-16C-4(A); and any such other and further relief as the Courts deems just and proper.

<u>JURY DEMAND</u>

Plaintiffs hereby demand trial by jury on all issues so triable.


Filed this <u>27th</u> day of May, 2024.

> Respectfully Submitted,
>
> *-/s/ - Trent A. Howell –*
> *Electronically filed & signed-*
> Attorney Trent A. Howell
> P.O. Box 2304
> Santa Fe, New Mexico  87504
> trent@trentahowell.com
> (505) 919-9158
>
> *Counsel for Plaintiffs*