## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

NATALIE BRADLEY and REBECCA
ALVAREZ,

        Plaintiffs,

vs.                                                    Civ. No.  24-cv-00497

NEW MEXICO HIGHLANDS UNIVERSITY,
BOARD OF REGENTS OF NEW MEXICO
HIGHLANDS UNIVERSITY (A/K/A THE
BOARD OF REGENTS OF NEW MEXICO
NORMAL UNIVERSITY), GLORIA GADSDEN,
and JILL DIAMOND.

        Defendants.

## JOINT STATUS REPORT AND PROVISIONAL DISCOVERY PLAN

Pursuant to FED. R. CIV. P. 26(f), a meeting was held telephonically on February 7,

2025.  Attending the telephonic conference was:

**For the Plaintiff**:

Trent A. Howell, Attorney
P.O. Box 2304
Santa Fe, NM  87504
(505) 919-9158
trent@trentahowell.com

**For the Defendant**:

Michelle Lalley Blake
Allen Law Firm, LLC
6121 Indian School Rd., NE
Suite 230
Albuquerque, NM 87110
(505) 298-9400
mblake@mallen-law.com

1

## NATURE OF THE CASE

Plaintiff, a former NMHU employee, alleges discrimination, retaliation, and wrongful termination by Defendants in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*., Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq*., as amended by the ADA Amendments Act of 2008, Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 701 *et seq*., New Mexico Human Rights Act (HRA), NMSA § 28-1-1, *et. seq*., and New Mexico Whistleblower Protection Act (WPA), NMSA § 10-16C-4 NMSA 1978, *et seq*.

## AMENDMENTS TO PLEADINGS AND JOINDER OF PARTIES

Plaintiff intends to file:        Potentially, an Amended Complaint.

Plaintiff should be allowed thirty (30) days after the Rule 16 Scheduling Conference on February 28, 2025 to move to amend the pleadings and to join additional parties in compliance with the requirements of Fed. R. Civ. P. 15(a).

Defendant intends to file:      None at this time.

Defendants should be allowed sixty (60) days after the Rule 16 Scheduling Conference on February 28, 2025 to move to amend the pleadings and to join additional parties in compliance with the requirements of Fed. R. Civ. P. 15(a).

## STIPULATIONS

The parties hereto stipulate and agree that venue is properly laid in this District; that the United States District Court for the District of New Mexico has jurisdiction of the parties and the subject matter.

The parties are willing to further stipulate to the following facts:  none at present.

## PLAINTIFF'S CONTENTIONS:

Defendants knowingly, willfully, and without good-faith basis or belief of legality resisted accommodation of, harassed, discriminated, retaliated against, and terminated Ms. Bradley from employment effective January 27, 2023, and similarly over corresponding periods

of time resisted accommodation of, harassed, discriminated, and retaliated against faculty

member Dr. Rebecca Alvarez (a former Associate Professor of Sociology and Criminal Justice in

the Department of Sociology, Anthropology and Criminal Justice) and other staff and students

based on serious health/medical condition, disability, and opposition/participation acts in which

Plaintiff Bradley and Dr. Alvarez asserted their own and others rights as employees, students,

and/or persons accessing public accommodations of or receiving services or participating in

programs provided by NMHU as a governmental entity and recipient of federal funds.

Venue is appropriate because the actions complained of are conduct and employment

practices of Defendants, who operate and employed Bradley within the District of New Mexico,

subject to the employment laws of the State of New Mexico.  28 U.S.C. § 1391.  And such

actions subject Defendants to the personal jurisdiction of the District of New Mexico as to this

civil action.  Id.

The facts above and herein make this action timely, confer jurisdiction over the parties

and subject matter hereto in the District of New Mexico, and make this District a proper venue in

which Plaintiff may file this lawsuit.

Plaintiff is an employee (as a former Coordinator of Disability Services), and qualified

individual with a serious health/medical condition and disability (including but not limited to

PTSD and Generalized Anxiety Disorder) within the meaning of the FMLA, ADA, Section 504,

HRA, and WPA.

Defendants NMHU and Regents are a "program or activity" within the meaning of

Section 504, 29 U.S.C. § 794(b)(2); "receiving federal financial assistance" within the meaning

of Section 504, 29 U.S.C. § 794(a); "persons" and "employers" within the meaning of FMLA, 29

U.S.C § 2611(4), ADA, 42 U.S.C § 12111(5), Section 504, 29 U.S.C. § 791(f), HRA, NMSA §

28-1-2(B) and (A); "public employers" within the meaning of WPA, NMSA § 10-16C-2(C); a

"public accommodation" within the meaning of HRA, NMSA § 28-1-2(h) and NMSA § 28-1-7(f); a "governmental entity" within the meaning of HRA, NMSA § 28-1-2(bb) and (cc) and NMSA § 28-1-7(m); and covered entities within the meaning of the FMLA, ADA, 42 U.S.C § 12111(2), Section 504, HRA, and WPA.

Defendants Dr. Gadsden and Ms. Diamond are "persons" and "employers" within the meaning of FMLA, 29 U.S.C § 2611(4), and HRA, NMSA § 28-1-2(B) and (A).

Bradley is a person with a disability and serious health/medical condition within the meaning of the FMLA, 29 U.S.C § 2611(11), ADA, 42 U.S.C § 12102, Section 504, 29 U.S.C. § 791(f), and HRA, NMSA § 28-1-2(o) and NMSA § 28-1-7(a), as she has mental and/or physical impairments that cause substantial limitations to "major life activities," such as sleeping, concentrating, and thinking.  See ADA Amendments Act of 2008, Section 4 (amending Section 3 of 42 U.S.C. 12102).

Prior to her termination from NMHU, Plaintiff also had a record of disability and had been regarded as having a disability.

NMHU also knew Ms. Bradley to have a representative/advocating "relationship or association" under 42 U.S.C. § 12112(b)(4) and 29 U.S.C. § 705(22) with the many NMHU students and faculty for whom she sought ADA and Section 504 rights and protections, such as opposing their being excluded from the participation in, denied the benefits of, or subjected to discrimination the programs and activities of NMHU within the meaning of 29 U.S.C. § 794(a).

Similarly, whether advocating disability rights/protections of NMHU employees under NMSA § 28-1-7(a) or students under NMSA § 28-1-7(f) (access to public services, facilities, accommodations, or goods) or NMSA § 28-1-7(m) (participants in governmental services or programs), Ms. Bradley was also engaging in opposition/participation activity broadly protected by NMSA § 28-1-7.

Plaintiff is "qualified" within the meaning of the ADA, Section 504, and HRA as Ms. Bradley meets the requirements for the position of Coordinator of Disability Services and can perform the essential functions of this position, having been employed by Defendants for approximately one year.

In January 2022—in the very process of hiring Ms. Bradley as "Coordinator of Disability Services" (a position structured almost entirely to discharge NMHU's ADA and Section 504 obligations, as detailed below)—NMHU immediately displayed its intent to discriminate based on disability.

ADA prohibits making disability-related inquiries of a job candidate until after the employer has extended a formal offer of employment. 42 U.S.C. § 12112(d)(2); 29 C.F.R. §§ 1630.13(a), 1630.14(a),(b).

But in January 2022, Defendants sent Ms. Bradley a disability-accommodations form to complete **before** Defendants had made Ms. Bradley a formal job offer.

Ms. Bradley did not receive a job offer from Defendants until a week later, assigning an official start date of February 7, 2022.

NMHU's prohibited pre-offer, disability-based inquiries were but the first of many behaviors by which it exhibited intent to discriminated based on disability.

The United States Court of Appeals for the Tenth Circuit has held a defendant engages in intentional disability-based discrimination if it is "deliberately indifferent" to ADA and Section 504 requirements. *See J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1298 & n.6 (10th Cir. 2016) (applying deliberate-indifference standard to a Title II damages claim); *Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (same as to a Section 504 damages claim). A plaintiff need not show the defendant acted with "ill will or animosity toward the disabled person." *Barber*, 562 F.3d at 1228. Rather, a plaintiff can simply demonstrate: "(1)

5

[the defendant acted with] 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that . . . likelihood.'" *Id*. at 1229 (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

NMHU's intent to discriminate based on disability was manifest in its pre-hiring process and only became more evident in its actions after hiring Ms. Bradley.

The position of Coordinator of Disability Services is an administrative position without essential physical requirements.

Ms. Bradley disclosed her disabilities to Defendants shortly after she was hired in early 2022 and requested reasonable accommodations thereafter.

Two of Ms. Bradley's reasonable accommodations requests were granted but one was initially denied without explanation or invitation to engage in the interactive process. After approximately one month of Ms. Bradley challenging Defendants' denial and refusal to engage, Defendants finally re-engaged with Ms. Bradley and approved the third request.  But after nominally approving the requests, Defendants then began a pattern of harassment and retaliation against Ms. Bradley that eventually culminated in termination.

The essential functions of Ms. Bradley's position are to ensure Defendants' compliance with federal and state law regarding persons with disabilities; receive and process student requests for reasonable accommodations; provide advocacy and guidance to students with disabilities; and provide education regarding accessibility and disability services to students, staff, and faculty.

Thus, an atmosphere allowing Mr. Bradley to speak up without fear of reprisal on ADA, Section 504, and HRA rights was essential both to her own job performance and to NMHU's compliance with those laws.  And much of Ms. Bradley's work as Coordinator of Disability Services included explicitly opposing, on behalf of students, practices on the part of faculty, staff

and administrators that may amount to "unlawful discriminatory practice" under state law or "discrimination" under federal law.

In discharge of her essential job functions, Ms. Bradley advocated on behalf of individual students for reasonable accommodations. As an example, in Spring 2022, Ms. Bradley advocated on behalf of students with blindness or other visual impairments who required course materials translated to braille.

For this advocacy, Ms. Bradley received immediate pushback from Defendants' faculty, who did not want to assist in securing these accommodations and who interfered with both the approval and implementation of these accommodations.  Senior faculty members and administrative agents, Dr. Gadsden and Dr. Kathy Jenkins ("Dr. Jenkins"), became involved and made a complaint to Ms. Bradley's supervisor, Dr. Ian Williamson ("Dr. Williamson") about Ms. Bradley. In an attempt to resolve this issue and work collaboratively with faculty and staff, Ms. Bradley met with Dr. Jenkins in Summer 2022 to discuss the issue and sent a follow-up letter to both Dr. Gadsden and Dr. Jenkins, memorializing the discussions regarding accommodations and asking them to encourage any concerned faculty members to contact her for support and assistance.

But NMHU continued resisting Ms. Bradley's efforts to bring NMHU into ADA, Section 504, and HRA compliance.  During Spring 2022, while struggling to get Defendants to respond to, approve, and provide her own accommodations, Ms. Bradley also struggled to get them to provide reasonable accommodations to students with disabilities

In these incidents, Ms. Bradley found that some instructors were receptive to disability accommodations, while others were not, and that administrators would side with instructors opposing the accommodations.  For example, Ms. Bradley attempted to aid a student of Dr. Jacob Avery ("Dr. Avery") who needed to have course materials converted from Adobe PDF

format to Microsoft Word.  Dr. Avery refused.  An academic advisor/counselor suggested the student transfer to Dr. Alvarez's class as an alternative, based on Dr. Alvarez's reputation of supporting students.  And Dr. Gadsden promptly called Ms. Bradley to complain of Ms. Bradley having made the request.

Ms. Bradley also gradually discovered NMHU's records for her office had been in disarray before she arrived.  Before Ms. Bradley began her employment with NMHU, Ricardo Martinez ("Mr. Martinez"), Assistant Director of Admissions and Recruitment, had been filling the role of Disability Services Coordinator in an interim capacity for approximately a year and a half.  When Ms. Bradley began as Disability Services Coordinator, she found records on students and their accommodation requests had not been well maintained, that some student requests for accommodations had gone entirely unaddressed prior to her hire, and that students who had requested reasonable accommodations had either not been approved or had been subjected to significant delays, depriving them of equal opportunities in their education.

In April of 2022, Ms. Bradley met with Jill Diamond.  At that time, Ms. Diamond had just been hired as the new Human Resources ("HR") Director for NMHU. Although two of Ms. Bradley's own accommodation requests had finally been resolved (the service dog and telework), she requested the appointment with Ms. Diamond to discuss systemic issues with employee accommodations at NMHU due to the seeming lack of a procedure for employees to engage in an interactive process for reasonable accommodation requests, and the need for a disability service coordinator for employees to address these issues.  In this meeting, Ms. Bradley talked about her need for a service dog and disclosed to Ms. Diamond that she had disabilities.  She shared the issues she had encountered when trying to have NMHU acknowledge, approve, and implement her requests for reasonable accommodations.  Ms. Bradley knew she was not the only employee struggling with this issue because several employees had come to her in the few

months she had been employed at that time, asking for assistance getting accommodations for themselves because HR had either referred them to her or had simply not responded to their requests.  Both of these alternatives had also happened to Ms. Bradley herself when seeking reasonable accommodations.  (Similarly, a graduate student at NMHU, who was also hired by NMHU to work as an instructor, would later write a letter discussing issues she had in getting HR to approve her service animal as an employee for Defendants, and how the issue went unaddressed for over six weeks until Ruth Mariampolski ("Ms. Mariampolski"), NMHU Director of Compliance and Title IX Coordinator, intervened on her behalf.)

Ms. Bradley in this time learned of other staff facing resistance and interference in connection with their disabilities or efforts to seek accommodations for themselves and others. For a time during Ms. Bradley's employment, NMHU had a website coordinator who, herself, had a disability and who left employment after trying to make changes to render the NMHU website more accessible for persons with disability under ADA considerations.  The website coordinator faced resistance from the administration for seeking these changes and appeared either terminated or pushed out of employment. After this website coordinator left, NMHU had no one responsible for assessing and implementing the school website's ADA compliance.

After the above events, Ms. Bradley observed Dr. Gadsden began opposing her whenever possible.  For example, whenever Ms. Bradley wanted to implement a change to improve student accessibility to services for their disabilities, Ms. Bradley would get approval from Dr. Williamson, and then present about the change in faculty meetings. At these meetings, Dr. Gadsden vigorously opposed changes proposed by Ms. Bradley—despite the fact accessibility issues were within Ms. Bradley's job description and competence, and by no means the expertise of Dr. Gadsden, who has a Ph.D. in Sociology.

After her first semester working with Defendants, Ms. Bradley had a better understanding

and insight into NMHU's pressing issues surrounding disability accommodations. Ms. Bradley took the initiative, in keeping with her job duties, to try to improve the culture around disability at NMHU.  She sought to increase knowledge and understanding of disability laws as well as familiarity with the services offered by her office to support students, faculty, and staff to ensure students with disabilities had equal access to NMHU's programs and services.  To do this, she reached out to Jeminie Shell, a disability specialist working in the New Mexico Governor's Office at the time, to collaborate on a training presentation on disability services.  The week before the Fall 2022 semester began, Ms. Bradley, along with Ms. Shell, presented to all faculty and staff employed by Defendants. The presentation provided information about her office— Academic Challenges and Cultivating Excellence in Student Success (ACCESS) Services—and how ACCESS worked to provide reasonable accommodations to students with disabilities in accordance with federal law.  In her presentation, Ms. Bradley discussed federal disability laws, types of disabilities, and resources available within and outside NMHU for instructors in providing accommodations, among other topics.

In Spring 2022, Ms. Bradley also advocated for a student with a serious medical condition needing accommodations and modifications in student meal plan policies.  This advocacy angered administrators such as Dr. Denise Montoya ("Dr. Montoya").  (According to NMHU's website, Dr. Montoya since November 2022 has been Associate Vice President for Finance, Administration, and Government Relations, but she was also Director of HR since 2015 and—as discussed below—continued to have or exercise authority over HR since assuming her Associate Vice President role.)  When Ms. Bradley advocated on the referenced student meal plan policies, Dr. Montoya and other administrators interfered with the approval of these accommodations.

At the time of this incident, Ms. Mariampolski acknowledged to Ms. Bradley that meal

plan policies were within Ms. Bradley's job description.  But Ms. Mariampolski warned Ms.

Bradley that Dr. Montoya was "anti-disability."  Ms. Mariampolski also warned Ms. Bradley

that although Dr. Montoya had been removed from HR (following a history of HR problems),

she continued to supervise and direct the HR functions of Ms. Diamond, who nominally replaced

Dr. Montoya in HR.

Ms. Mariampolski's statement to Ms. Bradley—that Dr. Montoya had ongoing control of

HR/disability decisions—was consistent with Dr. Alvarez's experience during this time.  On

August 25, 2021, Dr. Alvarez requested an accommodation (mental health-related) to hold

courses online, and the eventual approval for this accommodation came by email from Dr.

Montoya, despite her signature line reading "Associate Vice President for Finance,

Administration, and Government Relations/Adjunct Faculty."

According to her public LinkedIn profile, Ms. Mariampolski received a law degree in

2009; was for a combined 10 years a private lawyer, then government lawyer and hearing officer

in the area of employment law, including EEO and ADA; and since March 2020 has had the

following duties on behalf of NMHU:

> a.    ***Intake and investigation of complaints alleging discrimination***,
> including complaints ***under*** Title VII, ***the ADA***, and Title IX.
> b.    For non-Title IX matters, ***conduct investigations and write
> determinations which inform the President of the University of investigation
> findings and recommend a resolution***.
> c.    For Title IX matters, serve as Title IX Coordinator and Title IX
> Investigator.
> d.    Policy development relating to Title IX procedures under the 2020
> Title IX Final Rule.
> e.    Creation and implementation of training programs related to Title IX
> and other ***antidiscrimination law, applicable to students, faculty, staff, and
> administration***.
> f.    ***Provide*** research and ***expertise to Human Resources on
> employment law issues***.

*See* SAC, Exhibit A (Ruth Mariampolski LinkedIn Profile) (emphasis added).

Given Ms. Mariampolski's education, experience, "expertise," and NMHU duties and

authority, her admission of Dr. Montoya's "anti-disability" bias and abiding control over HR is imputable to NMHU as specific proof of an institutional intent to engage in disability-based discrimination and to have "anti-disability" bias as a motivating factor in its adverse employment action. *See* Fed. R. Evid. 801(d)(2) (allowing use of statement against opposing part if: "(C) ... made by a person whom the party authorized to make a statement on the subject; or (D) ... made by the party's agent or employee on a matter within the scope of that relationship and while it existed").

By general agency law, awareness of such facts by Ms. Mariampolski, within the course and scope of her job as Compliance Director, is imputed to the principal, NMHU. Under New Mexico law, "Since a corporation can act only through its officers, agents and employees, it is necessarily chargeable with the composite knowledge of its officers and agents acting within the scope of their authority." *Sawyer v. Mid-Continent Petroleum Corp.*, 236 F.2d 518, 520 (10th Cir. 1958) (applying New Mexico law) (citing 19 C.J.S., Corporations, § 1081, p. 618); *Trinity Universal Ins. Co. v. Rocky Mountain Wholesale Co.*, 353 F.2d 574, 577 (10th Cir. 1965) (applying New Mexico law); Restatement (Second), Agency, § 275. Similarly, under NMHRA, a manager's knowledge of an illegal employment practice imputes to the corporation. *See Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 34, 135 N.M. 539, 551-52. In *Ocana*, the New Mexico Supreme Court held that in evaluating who is authorized to receive binding notice of an NMHRA illegal employment practice for a corporation, the question is whether the individual has managerial authority or was part of the corporation's management. *Id.*

Imputing Ms. Mariampolski's particular knowledge regarding Dr. Montoya's "anti-disability" bias to NMHU is especially appropriate, since Ms. Mariampolski's self-described

duties include not only investigating discrimination, but also making determinations on such investigations, informing the NMHU President of her findings, and recommending corrective action or "resolution."  Ex. A.

Imputing Ms. Mariampolski's direct knowledge and comments regarding Dr. Montoya (as well as the President's presumed knowledge) to NMHU is also apt with respect to issues of Defendants' HRA and punitive-damage liability, because the Tenth Circuit holds scienter of senior controlling officers of a corporation may be attributed to the corporation itself to establish liability when those senior officials were acting within the scope of their apparent authority.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003) (citing *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001) (holding that the scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934); *Cromer Finance Ltd. v. Berger*, Nos. 00 Civ. 2284(DLC) & 00 Civ. 2498(DLC), 2002 WL 826847, at *7-8 (S.D.N.Y. May 2, 2002) (holding that scienter of partner of accounting firm could be imputed to the firm itself under traditional agency principles); *In re JDN Realty Corp. Sec. Litig.*, 182 F.Supp.2d 1230, 1246 (N.D.Ga. 2002) (holding that scienter of chief executive officer of defendant corporation was attributable to the corporation); 2 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 12.8[4], at 444 (4th ed. 2002) ("[K]nowledge of a corporate officer or agent acting within the scope of authority is attributable to the corporation.")

Further, by leaving Dr. Montoya with authority over NMHU HR even after its "Director of Compliance" and others (including Ms. Bradley after this conversation and, presumably, the NMHU President) knew of Dr. Montoya's "anti-disability" bias, NMHU:

a.    knowingly "utilize[ed] standards, criteria, or methods of administration" that "have the effect of discrimination on the basis of disability" and "perpetuate the discrimination of others who are subject to common administrative control," 42 U.S.C. § 12112(b)(3);

b.    willfully institutionalized "discriminat[ion] against a qualified individual on the basis of disability," *id.*;

c.    signaled to both students and employees of NMHU that HR and the administration at large were no more than a catch-and-kill trap or dead-end alley for complaints of disability discrimination or retaliation;

d.    again displayed "deliberate indifference" to the requirements of ADA, Section 504, and HRA, by:

i.    avowing "knowledge that a harm to a federally protected right is substantially likely"; and

ii.    admitting its "failure to act upon that ... likelihood," *Barber*, 562 F.3d at 1229 (quoting *Duvall*, 260 F.3d at 1139); and

e.    thus admitted its past and future intent to discriminate based on disability.  *See J.V.*, 813 F.3d at 1298 & n.6; *Barber*, 562 F.3d at 1228.

Further, Dr. Williamson also warned Ms. Bradley that Dr. Montoya was politically powerful and that Ms. Bradley could expect negative consequences.  And in demonstration and proof of this threat, after Ms. Bradley noted to Mr. Williamson that approving meal plans was in her job description, NMHU removed such duties from Ms. Bradley's job description, and Mr. Williamson informed Ms. Bradley that Dr. Montoya would be taking over such duties.

By warning Ms. Bradley that Dr. Montoya posed a looming threat to her employment, while themselves offering no alternatives and taking no action to resist Dr. Montoya's bias infecting employment actions, both Ms. Mariampolski and Dr. Williamson were doing nothing but, themselves, threatening Ms. Bradley against advocating for ADA, Section 504, and ADA compliance.

Still, beginning in late Summer and early Fall 2022, Ms. Bradley began advocating for an increase to her department's budget to meet the needs of all students with disabilities on campus. Ms. Bradley was ultimately able to secure a significant increase to her department's budget, which ensured the provision of translation and interpretation services, assistive technology, and

other services and supports students with disabilities are entitled to.

But again, during her push to increase her department's budget, Ms. Bradley was met with pushback and criticism from Defendants' administrators who were angered by her vocal opposition to their practices.

In Fall 2022, Ms. Bradley collaborated with the Internet Technology Department ("IT") and Center for Teaching Excellence ("CTE") to develop training modules for instructors to facilitate rendering their course materials in accessible formats, such as an instructional module on how to obtain transcripts from videos so they can be available to students. This service was needed for a student who is blind, so she could read the transcripts with her computer device that converts Microsoft Word documents into braille. This student enrolled in an archeology course with Victoria Evans ("Ms. Evans") as the instructor. Ms. Evans reached out to IT for assistance, reviewed the instructions, and received help from a contract worker hired to provide special assistance regarding technology for the blind. Ms. Evans considered this a professional growth opportunity and considered it part of her duties to make sure her course materials are accessible. But shortly after the class began, Ms. Evans reported to Ms. Bradley that Dr. Gadsden pressured Ms. Evans not to engage in these activities, claiming it was not her responsibility. Ms. Evans pushed back, stating the changes did not require significant extra time, and she felt it, indeed, was her responsibility to make such simple changes. Dr. Gadsden then expressed frustration with this 'setting a precedent' for other instructors to follow. (And after Ms. Evans then retired, in Spring/Summer 2023, she told Ms. Bradley NMHU had delayed or denied typical provision of her retirement funds, forcing Ms. Evans to fight to receive them.)

In addition, despite Ms. Bradley's prior efforts to work with Dr. Gadsden and Dr. Jenkins in Summer 2022 (inviting them to come to her again in the future for assistance and asking them to encourage instructors to do the same), in January 2023, Dr. Gadsden and Dr. Jenkins again

made a complaint directly to Dr. Williamson regarding accommodation letters for the Spring 2023 semester—again without reaching out to Ms. Bradley or trying to resolve the issues they had directly with her beforehand.

The pushback against Ms. Bradley's advocacy in these examples and in other cases, ultimately led to threats and reprisals against her from Defendants and their faculty and administrators.

On January 10-11, 2023, Ms. Bradley attended the NMHU President's Council for Diversity, Equity, and Inclusion ("PCDEI") retreat.  At this meeting, Ms. Bradley spoke out in support of Defendants' employees with disabilities and voiced her opposition to Defendants' practices regarding accessibility for employees.  Ms. Bradley voiced concerns about the seeming lack of policies and procedures for employees with disabilities requesting reasonable accommodations, leading to significant delays or simply no response to requests.  Ms. Bradley spoke about the need for an ADA coordinator for employees who could implement policies and procedures and ensure that Defendants were acting in accordance with the ADA. Upon returning to campus the following week for the beginning of the Spring 2023 semester, Ms. Bradley learned from the Ms. Mariampolski that NMHU's liaison to the Higher Learning Commission (HLC) (the accrediting institution for colleges and universities in the United States), Keith Tucker, was present at the PCDEI retreat and later approached Ms. Mariampolski to discuss some of the issues Ms. Bradley had raised.  Ms. Bradley then called Mr. Tucker to tell him she did not know he was the liaison to HLC or that he would be taking her statements back to Defendants' administration.  Ms. Bradley also expressed concern to Mr. Tucker that Defendants "might fire her" for speaking out about these issues.  Mr. Tucker confirmed that he had repeated Ms. Bradley's statements to NMHU administration.

Shortly after this meeting, Defendants told Ms. Bradley she was required to request

renewals for her own reasonable accommodations despite there being no issues with her work performance, or changes in her disabilities and serious medical condition at that time.

During this time, Dr. Gadsden and Dr. Kathy Jenkins made another complaint about Ms. Bradley to her supervisor, Dr. Williamson, and then continued to raise their complaints at a Faculty Senate meeting.

Throughout January 2023, Ms. Bradley experienced growing hostility in the workplace, which finally did adversely impact her mental health.

By the beginning of the Spring 2023 semester, Ms. Bradley felt increasingly intimidated by Dr. Gadsden. On multiple occasions in January of 2023, Ms. Bradley witnessed Dr. Gadsden standing and waiting in areas near Ms. Bradley's office, seemingly watching her arrive or leave. On these occasions, Dr. Gadsden did not greet Ms. Bradley or approach her to discuss anything. Dr. Gadsden engaging in this behavior felt hostile to Ms. Bradley, and she told an ACCESS office coworker about it.  This colleague offered to walk Ms. Bradley to her office because of this, and when later doing so, the colleague witnessed Dr. Gadsden engaging in this behavior.

At the beginning of the Spring 2023 semester, Dr. Williamson also told Ms. Bradley the university was making everyone renew telework contracts through HR.  He told Ms. Bradley she would have to submit a telework request to HR.  Ms. Bradley emailed HR asking how to proceed and what information HR needed.  Ms. Diamond responded, copying Roberta Vigil ("Ms. Vigil").  Ms. Diamond told Ms. Bradley the telework agreement on file for her was effective until March 7, 2023, and if she would be requesting to continue teleworking after March 7, 2023, she should fill out an accommodation request form and include substantiating medical documentation.  (Note, in light of her February 2022 start date, by March 7, 2023, Ms. Bradley would have easily satisfied the FMLA's months (12) and hours (1,250) of service requirements.) When Ms. Diamond told Ms. Bradley this, Ms. Bradley replied stating concern about the number

of people who might access her medical information.  But Ms. Diamond never provided clarity

on this point.  Ms. Bradley began preparing the telework contract, but still sought information

about who the ADA coordinator for Defendants was because she wanted to be sure her

information was being kept confidential.

Ms. Bradley was concerned about Dr. Montoya having access to her confidential

information, both because of Dr. Montoya's confrontation with Ms. Bradley in October of 2022

and because of the warnings Ms. Mariampolski and Dr. Williamson had given of Dr. Montoya's

bias and inclination to retaliate.

In mid-January 2023, Ms. Bradley's work environment had thus become broadly,

pervasively hostile, with her direct supervisor (Dr. Williamson), NMHU's "Compliance"

Director (Ms. Mariampolski), the known force behind HR (Dr. Montoya), and other powerful

faculty (Dr. Gadsden and Dr. Jenkins)—all avowing, exhibiting, and implicitly condoning and

ratifying institutionalized animus toward disabilities services.  Ms. Bradley's condition (her

disabilities and serious medical condition) thus deteriorated.  Following the advice of her

healthcare providers, Ms. Bradley requested temporary medically necessary leave. This request

was made through the appropriate procedures, but Defendants denied this request.

Because of the events addressed above, Ms. Bradley felt increasingly stressed, which

triggered her asthma and worsened her mental health.  Ms. Bradley was experiencing an increase

in difficulty breathing related to her asthma as well as anxiety and panic attacks.  In mid-January,

Ms. Bradley began working on getting medical appointments scheduled to address the changes to

her mental health.  She secured two appointments for January 27, 2023, to address her physical

and mental health and asthma concerns. Ms. Bradley communicated her need to take sick leave

to attend these medical appointments to Dr. Williamson first by email, and then also by

following up with a phone call.

About a week after these events, at the beginning of the Spring 2023 semester, on January 26th at 4:28 p.m., Ms. Diamond sent Ms. Bradley an email informing her that a meeting in HR was being scheduled for the following day, January 27th, at 1:30 pm.  Ms. Bradley responded to Ms. Diamond's email at 4:34 pm, asking the purpose of the meeting and informing Ms. Diamond that she already had a personal appointment scheduled from 1-2 pm on January 27th. Ms. Bradley asked Ms. Diamond to offer an alternative time for the meeting.  At 5:07 pm, Ms. Diamond replied that she would reschedule the meeting to 11 am for the following day and said she would share the purpose of the meeting upon Ms. Bradley's arrival.

On the morning of January 27, 2023, at 9:00 am, Ms. Bradley informed Ms. Diamond she was on sick leave that day to attend her two medical appointments and asked for the meeting to be rescheduled for the following week. (These were the appointments she had scheduled to seek treatment for her mental health as the stress she had been experiencing at work was triggering for her mental illness as well as her asthma.) About an hour later at 9:57 am, Ms. Bradley had just left her first medical appointment for the day and sent Ms. Diamond an email with the subject line reading, "Please see attached letter and please advise about FMLA process.  Thank you." The letter Ms. Bradley had attached was from her healthcare provider, dated January 27, 2023. The letter informed NMHU that Ms. Bradley was seen that morning and should be excused from work to get "medical and psychological help ... to be able to function."  At 3:41 pm that afternoon, Ms. Diamond sent Ms. Bradley an email stating the purpose of the meeting scheduled for that day was to hand deliver a termination letter to Ms. Bradley. Ms. Diamond attached the letter to the email and instructed Ms. Bradley to return all NMHU property and retrieve any personal effects she had on campus.  The attached termination letter read that NMHU was exercising its right to terminate Ms. Bradley's employment during her probationary period.

At the time she received notice of termination, Ms. Bradley had just seven business days

left in her 12-month probationary period.  Thus, in turn, she was also just seven business days

shy of satisfying the "12 month" service requirement for FMLA eligibility to take leave.

Defendants' termination notice simply justified Ms. Bradley's termination as an exercise

of their right to terminate any employee during the employee's probationary period; no

performance or other specific reason was provided.

After being terminated, Ms. Bradley sought to recover her personal property from her

office (through a coworker) but found a blue bag of personal textbooks missing.   When she

inquired about them, NMHU gave no significant response and took no action.  When Ms.

Bradley contacted campus police, they also took no action.  Finally, Ms. Bradley contacted Ms.

Diamond, informed her the textbooks were worth over $500, and stated Ms. Bradley intended to

report the matter as a potential felony.  And only then did someone (whom Ms. Diamond

declined to identify) purportedly returned the books to HR for Ms. Bradley to retrieve.

In turn, Ms. Bradley alleges Defendants willfully, maliciously, and recklessly:

>   a.    aided, abetted, compelled or coerced the commission of unlawful
> discriminatory practice based on disability and serious medical condition and based on
> Ms. Bradley's relationship/association with disabled persons for whom she advocated;
>   b.    engaged in threats and reprisals against her for her opposition of unlawful
> discriminatory practice based on disability and serious medical condition (on behalf of
> others and on behalf of herself);
>   c.    willfully obstructed and prevented her and others from complying with
> provisions of the ADA, HRA, and other state and federal laws;
>   d.    retaliated against her by taking adverse employment actions against her;
>   e.    denied requests for reasonable accommodations (including leave requests)
> and refused to engage in the interactive process to address any concerns with those
> requests; and
>   f.    engaged in a pervasive pattern of harassment against her that fostered a
> hostile work environment.

Ms. Bradley further asserts that Defendants' known mistreatment of other persons

requesting health/medical/disability accommodations, such as Dr. Alvarez and others to be

identified and discussed through discovery, demonstrate a broad, institutionalized pattern and

practice at NMHU of consciously disregarding the rights of such persons under FMLA, ADA, Section 504, HRA, and WPA.

Ms. Bradley further asserts Defendants did the foregoing in willful, malicious, and reckless violation of FMLA, ADA, Section 504, HRA, and WPA.

In turn, Ms. Bradley, on June 12, 2023 filed a Charge of Discrimination with New Mexico Human Rights Bureau ("NMHRB")  and Equal Employment Opportunity Commission ("EEOC"), obtaining an NMHRB Letter of Determination, purportedly issued/placed in the mail on February 20, 2024 (though Ms. Bradley did not, in fact, receive it until March 4, 2024), and an EEOC Notice of Rights to Sue issued on or about April 3, 2024, making Ms. Bradley's original ADA and NMHRA Complaint (entered on this Court's docket May 20, 2024) timely filed within 90 days thereafter.

In all the above, Defendants engaged in a pattern of preying upon known disabilities of an employee (Ms. Bradley), undermining her job performance, reducing her authority within NMHU, and destabilizing her physical and/or mental condition to a point that would either drive her into medical leave, forced resignation, or fabricated grounds for termination.  And Defendants—especially Dr. Gadsden—repeated that pattern toward others, including Dr. Alvarez.

Plaintiff requests that the Court order as to her claims for violations of FMLA, ADA, Section 504, HRA, and WPA, that Plaintiff be awarded damages, including but not limited to unpaid or underpaid wages; back and front pay and benefits; pre- and post-judgment interest as permitted by law; emotional distress; additional liquidated damages in the amount of the same foregoing; punitive damages; costs and reasonable attorneys' fees; damages under NMSA §10-16C-4(A) including actual damages including back pay, reinstatement, two times the amount of back pay, interest on the back pay, special damages including emotional distress and associated

medical bills; and the same and further common-law damages pursuant to NMSA §10-16C-4(C); costs and attorney fees pursuant to NMSA §10-16C-4(A); and any such other and further relief as the Courts deems just and proper.

## DEFENDANTS' CONTENTIONS:

New Mexico Highlands University is not a proper party to the lawsuit per NMSA 1978 § 21-3-4. Defendants incorporate by reference their answer and affirmative defenses and deny they discriminated, retaliated or wrongfully terminated Plaintiff in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*., Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq*., as amended by the ADA Amendments Act of 2008, Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 701 *et seq*., New Mexico Human Rights Act (HRA), NMSA § 28-1-1, *et. seq*., or the New Mexico Whistleblower Protection Act (WPA), NMSA § 10-16C-4 NMSA 1978, *et seq*.

## PROVISIONAL DISCOVERY PLAN

I.    **Plaintiff**

A.    Currently known potential witnesses:

1.    Plaintiff (c/o Plaintiff's counsel), regarding her qualifications and experience as Coordinator of Disability Services; the circumstances, terms, compensation, and benefits of her hiring and employment with Defendants; the nature and prospects of Defendant's business operations; the parties' respective performances during her employment; Defendants' workplace, environment, policies and practices in general as well as specifically surrounding executive compensation; the workplace demographics; the pretexts under which Defendants pressured Plaintiff out of employment; the termination of her employment; her subsequent efforts to mitigate losses; and her emotional and financial damages, fees, and costs;

2.    Dr. Rebecca Alvarez, regarding Plaintiff's qualifications and experience as Coordinator of Disability Services; the circumstances, terms, compensation, and benefits of her hiring and employment with Defendants; the nature and prospects of Defendant's business operations; the parties' respective

performances during her employment; Defendants' workplace, environment, policies and practices in general as well as specifically surrounding executive compensation; the workplace demographics; the pretexts under which Defendants pressured Plaintiff out of employment; the termination of Plaintiff's employment; and persons who have replaced Plaintiff in her former position;

3.      Dr. Gloria Gadsden (c/o Defendants' counsel), regarding Plaintiff's qualifications and experience as Coordinator of Disability Services; the circumstances, terms, compensation, and benefits of her hiring and employment with Defendants; the nature and prospects of Defendant's business operations; the parties' respective performances during her employment; Defendants' workplace, environment, policies and practices in general as well as specifically surrounding executive compensation; the workplace demographics; the pretexts under which Defendants pressured Plaintiff out of employment; the termination of Plaintiff's employment; and persons who have replaced Plaintiff in her former position;

4.      Jill Diamond (c/o Defendants' counsel), regarding Plaintiff's qualifications and experience as Coordinator of Disability Services; the circumstances, terms, compensation, and benefits of her hiring and employment with Defendants; the nature and prospects of Defendant's business operations; the parties' respective performances during her employment; Defendants' workplace, environment, policies and practices in general as well as specifically surrounding executive compensation; the workplace demographics; the pretexts under which Defendants pressured Plaintiff out of employment; the termination of Plaintiff's employment; and persons who have replaced Plaintiff in her former position;

5.      Ruth Mariampolski (c/o Defendants' counsel), regarding Plaintiff's qualifications and experience as Coordinator of Disability Services; the circumstances, terms, compensation, and benefits of her hiring and employment with Defendants; the nature and prospects of Defendant's business operations; the parties' respective performances during her employment; Defendants' workplace, environment, policies and practices in general as well as specifically surrounding executive compensation; the workplace demographics; the pretexts under which Defendants pressured Plaintiff out of employment; the termination of Plaintiff's employment; and persons who have replaced Plaintiff in her former position;

6.      Dr. Denise Montoya (c/o Defendants' counsel), regarding Plaintiff's qualifications and experience as Coordinator of Disability Services; the circumstances, terms, compensation, and benefits of her hiring and employment with Defendants; the nature and prospects of Defendant's business operations; the parties' respective performances during her employment; Defendants' workplace, environment, policies and practices in general as well as specifically surrounding executive compensation; the workplace demographics; the pretexts under which Defendants pressured Plaintiff out of employment; the termination of Plaintiff's employment; and persons who have replaced Plaintiff in her former position;

7.      Dr. Ian Williamson (c/o Defendants' counsel), regarding Plaintiff's qualifications and experience as Coordinator of Disability Services; the

circumstances, terms, compensation, and benefits of her hiring and employment with Defendants; the nature and prospects of Defendant's business operations; the parties' respective performances during her employment; Defendants' workplace, environment, policies and practices in general as well as specifically surrounding executive compensation; the workplace demographics; the pretexts under which Defendants pressured Plaintiff out of employment; the termination of Plaintiff's employment; and persons who have replaced Plaintiff in her former position;

8.    Victoria Evans (c/o Defendants' counsel), regarding Plaintiff's qualifications and experience as Coordinator of Disability Services; the circumstances, terms, compensation, and benefits of her hiring and employment with Defendants; the nature and prospects of Defendant's business operations; the parties' respective performances during her employment; Defendants' workplace, environment, policies and practices in general as well as specifically surrounding executive compensation; the workplace demographics; the pretexts under which Defendants pressured Plaintiff out of employment; the termination of Plaintiff's employment; and persons who have replaced Plaintiff in her former position;

9.    All witnesses designated by Defendants;

10.    Plaintiff reserves the right to disclose other witnesses disclosed in the course of discovery.

B.    Documents known at this time and which may be exhibits at trial:

1.    NMHU's Employee Policies;

2.    NMHU's records on student and staff requests for disability accommodations or FMLA leave requests;

3.    Email correspondence to, from, and among Plaintiff and Gadsden, Diamond, Mariampolski, and/or Montoya;

4.    Documents pertaining to NMHU's compensation and employee benefits provided to Plaintiff and/or to other employees who occupied Plaintiff's position with NMHU before or since her termination; and

5.    Any documents designated by Defendants.

C.    Plaintiff has not yet retained and/or determined testifying experts in this case.

Such information will be supplemented at such time as when determinations regarding

testifying experts are made.

## II.    Defendant

A.  Currently known potential witnesses:

1.      Jill Diamond

2.      Dr. Gloria Gadsden

3.      Brandon Kempner

4.      Dr. Rozanne Gonzales Walker

5.      Dr. Ian Williamson

6.      Dr. Denise Montoya

7.      Ruth Mariampolski

8.      Roberta Vigil

9.      Rose McDonald, CNP

10.    Any person identified in Plaintiff's Complaint

11.    Any person listed or identified by Plaintiff

B.  Documents known at this time and which may be exhibits at trial:

1.      NMHU's Employee Policies;

2.      Documents produced in conjunction with and in response to Charges of Discrimination filed by Rebecca Alvarez and Natalie Bradley;

3.      Documents related to Plaintiff's request for leave and/or absence from work;

4.      Plaintiff's medical records;

5.      Personnel file of Natalie Bradley;

6.      Correspondence/emails from or to any of the persons identified as persons identified as potential witnesses above, and/or pertaining to Rebecca Alvarez and/or Natalie Bradley;

       7.      Any document listed or identified by Plaintiff.

     C.     Experts known at this time who may testify at trial: Defendants have not made a determination about experts who may be called to testify at trial.  Experts will be disclosed in accordance with the Court's Scheduling Order.

**IV.**    **The Parties jointly propose to the Court the following discovery plan**:

Discovery will be needed on the following subjects:  All causes of action raised in the complaint and any defenses raised by Defendants in answering the Complaint.

     Maximum of 25 interrogatories and requests for production by each party to any other party.  Responses due thirty (30) days after service per the Federal Rules of Civil Procedure.

     Maximum of 25 requests for admission by each party to any other party.  Responses due thirty (30) days after service per the Federal Rules of Civil Procedure.

     Maximum of ten (10) depositions by Plaintiff and ten (10) by Defendant(s).

     Each deposition (other than of Parties) is limited to a maximum of four (4) hours, excluding breaks, unless extended by agreement of Parties.  Depositions of the Parties is limited to seven (7) hours, excluding breaks, unless extended by agreement of the Parties or after seeking leave of the Court.

     Reports from retained experts under Rule 26(a)(2) due:

          from Plaintiff on or before September 12, 2025.

          from Defendant(s) on or before October 10, 2025.

     Supplementation under Rule 26(e) is due by November 7, 2025 for all Parties.

     All discovery commenced in time to be complete by December 5, 2025.

     Other Items:

**<u>PRETRIAL MOTIONS</u>**

Plaintiff intends to file a Motion for Summary Judgment.

Defendants intend to file Motion(s) for Summary Judgment and/or Motions to Dismiss

## ESTIMATED TRIAL TIME

The parties estimate trial will require three (3) to four (4) days.

_____ This is a non-jury case.

 X   This is a jury case.

The parties request a pretrial conference in 45 days.

## SETTLEMENT

The possibility of settlement in this case is not able to be determined at this time.

The parties request a settlement conference at or near close of discovery.

## EXCEPTIONS

APPROVED WITH/WITHOUT EXCEPTIONS
(note exceptions above)


For Plaintiff:

*-/s/ - Trent A. Howell –*
*Electronically filed & signed-*
Attorney Trent A. Howell
P.O. Box 2304
Santa Fe, New Mexico 87504
trent@trentahowell.com
(505) 919-9158
*Counsel for Plaintiff Natalie Bradley*

For Defendants:
*/s/ Michelle Lalley Blake*
Michelle Lalley Blake
ALLEN LAW FIRM, LLC
6121 Indian School Rd. NE, Ste. 230
Albuquerque, NM 87110
(505) 298-9400
mblake@mallen-law.com
*Attorneys for Defendants Board of Regents of New Mexico*
*Highlands University, Gloria Gadsden and Jill Diamond*

27